# EXHIBIT A

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
901 NORTH STUART ST., STE.1300
ARLINGTON, VA  22203


CROWELL & MORING, LLP
CALHOUN, ESQ., BRIDGET E.
1001 PENNSYLVANIA AVE., NW
WASHINGTON, DC  20004

IN THE MATTER OF            FILE A 79-187-167        DATE: Dec 3, 2007
KARAKE, FRANCOIS


___ UNABLE TO FORWARD - NO ADDRESS PROVIDED

X  ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE.  THIS DECISION
   IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
   WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
   SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
   YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
   MUST BE MAILED TO:    BOARD OF IMMIGRATION APPEALS
                         OFFICE OF THE CLERK
                         P.O. BOX 8530
                         FALLS CHURCH, VA  22041


___ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
    OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
    THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
    WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
    SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
    8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS.  IF YOU FILE A MOTION
    TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                         IMMIGRATION COURT
                         901 NORTH STUART ST., STE.1300
                         ARLINGTON, VA  22203

___ OTHER: _____
           _____

                         _Phylis C. Caddy_____
                         COURT CLERK
                         IMMIGRATION COURT                              FF

   CC: MARY ELLEN TSEKOS
       901 N. STUART ST., STE. 708
       ARLINGTON, VA,  22203

## UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
#### United States Immigration Court
#### 901 North Stuart Street, Suite 1300
#### Arlington, Virginia 22203

| | | |
|---|---|---|
| **IN THE MATTER OF:** | ) | **IN REMOVAL PROCEEDINGS** |
| | ) | |
| | ) | |
| KARAKE, Francois | ) | **File No. :**   A# 79-187-167 |
| | ) | |
| Respondent | ) | |
| | ) | |
| | ) | |

**CHARGE:** Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA" or "Act"), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, other suitable travel document, or document of identity and nationality as required under INA § 211(a).

**APPLICATIONS:** Asylum, pursuant to INA § 208(a);
Withholding of Removal, pursuant to INA § 241(b)(3);
Withholding of Removal, under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), pursuant to 8 C.F.R. § 1208.16 (2007); and
Deferral of Removal, under the CAT, pursuant to 8 C.F.R. § 1208.17.

## APPEARANCES

**ON BEHALF OF RESPONDENT:**
Bridget E. Calhoun, Esq.
Ryan C. Tisch, Esq.
Matthew R. Scarlato, Esq.
Nancy J. Craig, Esq.
Crowell & Moring, LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

**ON BEHALF OF THE DHS:**
Jo Ellen Ardinger, Esq.
Daniel I. Smulow, Esq.
Associate Legal Advisors
Department of Homeland Security
901 North Stuart Street, Suite 1307
Arlington, Virginia 22203

## DECISION AND ORDER

### I. PROCEDURAL HISTORY

Respondent is a 43-year-old male, and a native and citizen of Rwanda, who was paroled into the United States on March 2, 2003 at San Juan, Puerto Rico. The Department of Homeland Security alleges that his parole has expired or been revoked, and that Respondent does not possess a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document.

The Department of Homeland Security ("DHS") commenced removal proceedings against Respondent on February 27, 2007 by filing a Notice to Appear ("NTA") with the Court. The DHS charges Respondent as inadmissible pursuant to INA § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA" or "Act"), as amended, as an immigrant who, at the time of application for admission, was not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, other suitable travel document, or document of identity and nationality as required under INA § 211(a).

At a master calendar hearing before the Arlington Immigration Court, Respondent, through counsel, conceded proper service of the NTA, admitted to the factual allegations, and conceded the charge under INA § 212(a)(7)(A)(i)(I). This Court therefore finds Respondent's charge of removability to be sustained by clear and convincing evidence. See 8 C.F.R. § 1240.8(a).

On August 17, 2006, following an indictment charging Respondent and two other defendants with killing American tourists in the Bwindi Impenetrable National Forest ("Bwindi") on March 1, 1999, the United States District Court for the District of Columbia granted Respondent's joint motion to suppress statements made to Rwandan and United States officials, finding that the statements resulted from physical and psychological coercion and torture. See United States v. Karake, 443 F.Supp. 2d. 8, 94 (D.D.C. 2006).

As relief from removal, Respondent seeks to renew his application for asylum, filed with the Arlington Immigration Court on June 19, 2007. In the alternative, he seeks withholding of removal to Rwanda under INA § 241(b)(3), withholding of removal to Rwanda under the CAT pursuant to 8 C.F.R. § 1208.16, and deferral of removal to Rwanda under 8 C.F.R. § 1208.17.

For the reasons discussed below, the Court will deny Respondent's application for asylum, withholding of removal under INA § 241(b)(3), and withholding of removal under the CAT. The Court will grant Respondent's request for deferral of removal under the CAT.

## II. TESTIMONY AND EVIDENCE

### A.   Respondent's Asylum Application

Respondent filed his initial asylum application with the Arlington Immigration Court on June 19, 2007. <u>See</u> Exhibit 2. In his application and accompanying statements, Respondent relates that he was born on June 20, 1964 in Rwambona, Rwanda and is a Rwandan citizen. He writes that he is an ethnic Hutu. He was a member of the Army for the Liberation of Rwanda ("ALIR"), but notes that he did not kidnap or murder any tourists at Bwindi in Uganda.

Respondent writes that government authorities arrested and then detained him in Rwanda from December 2001 until the end of February 2003. Prison officials accused him of participating in the kidnapping and murder of tourists at Bwindi. He indicates that prison officials beat him numerous times, shackled him, and subjected him to sensory deprivation. He notes that he gave false confessions to American and Rwandan authorities as a result of this torture.

Respondent relates that because the same Rwandan authorities are in power, he believes that government officials will torture or kill him if he returns to Rwanda because he is a Hutu and considered an enemy of the ruling government.

### B.   Respondent's Testimony

Respondent testified that he is a Rwandan citizen and ethnic Hutu. He stated that he had testified before the District of Columbia District Court in 1999 and told the truth in that proceeding.

Respondent indicated that in 1994, he worked as a laborer in Kigali. He added that during that year, his life drastically changed following the assassination of President Juvenal Habyarimana. He stated that Rwanda's civil war intensified at that time, but he did not participate in any fighting. He noted that he and approximately 100 other Hutu and Tutsi civilians left Kigali by foot. He noted that none of these people carried any weapons. He and other Hutus lived in a series of refugee camps in Rwanda, and eventually fled to the Democratic Republic of the Congo ("Congo"), known as Zaire at that time, in 1996. He saw many dead bodies on the three- to four-month journey to Congo.

Respondent recalled that conditions in the Congolese refugee camps were very poor, and refugees had to abandon them when Rwandan Patriotic Front ("RPF") soldiers attacked the camps. He testified that he also lived in refugee camps in Congo, which the RPF also attacked. He believed that the RPF intended to kill all Hutus in these camps.

Respondent related that no armed people lived with him in Congo, even though ex-Rwandan Armed Forces ("FAR") members lived at the camp. He said that when he lived in the refugee camps there, he did not have a weapon, and he had never belonged to an armed group. Respondent noted that he married

3

while living in a Congolese camp, and had a child.

Respondent later testified, on cross examination, that ex-FAR soldiers had trained him for two months in self-defense in 1997. Respondent stated that the ex-FAR soldiers had weapons at the time in the camp, but he was not taught to use the weapons. Respondent admitted that he had testified before the District Court that the training lasted three months, not two. See Group Exhibit 7, Tab H, at 280, ¶ 4. He explained that the three months was an approximation, and that he did not keep track of dates as a refugee.

Respondent also stated that he had testified before the District Court that he trained with weapons, but that his reference to weapons merely referred to methods of self-protection. See Group Exhibit 7, Tab H, at 280-81, ¶¶ 19-21. The first "weapon" he trained in was "how to hide" family members and the elderly. He also learned other means of self-protection without weapons. Respondent noted that weapons can include guns and knifes, but also techniques of self protection. He related that he "never touched a gun" until he joined ALIR.

Respondent indicated that the RPF attacked his refugee camp in 1996. On that day, Respondent was taking bananas from a boat from a lake that was a 25-minute walk from the camp. Respondent said that he saw soldiers in boats shooting at the refugee camp. Respondent later testified that the lake was only 10 meters from the camp.

According to Respondent, RPF soldiers attacked him twice in Congo. During the first arrest in early 1996, RPF soldiers arrested him while he looked for firewood. Respondent noted that he knew the soldiers belonged to the RPF because of the way they spoke and dressed, and because they had discussed Rwanda. The soldiers beat him for approximately eight to ten hours and asked him to carry items for him. Respondent added that the soldiers held him for many days. He later corrected this testimony to indicate that the soldiers held him for "hours, not days." He found an opportunity to escape when the soldiers asked him to carry items for him.

Respondent stated that the second attack by the RPF occurred when a soldier shot him in the hip while he held a child who was trying to feed on its mother, who had just been killed.

Respondent later testified that his second attack occurred in 1997 when he went to an elderly man's house to juice bananas. On his way to the house, he encountered RPF soldiers who held him for approximately five to six hours, and guarded him with a man who held a machete. Respondent found an opportunity to escape, and the soldiers threw a machete at him, cutting a tree.

During cross examination, Respondent stated that the second attack occurred "toward" 1998 when the RPF destroyed his refugee camp. He stated that the RPF did not capture him during the second attack.

Respondent indicated that he eventually became separated from his wife in Congo. His wife was pregnant with a second child during an attack on the refugee camp where they had lived at the time. Respondent

recalled that "everyone ran" and he could not find his wife.

Respondent noted that he tried to return to Rwanda twice from Congo, but did not succeed. In 1998, he heard on the radio that Hutus should return to Rwanda because the conditions had improved for them and that the persons involved in the genocide would be punished. Respondent noted that he became very happy at the news. While he tried to cross into Rwanda near Ruhengeri, however, soldiers who he believed belonged to the RPF shot at him and others in the group from the ground and from planes. He and the other civilians had no guns, so they fled. Respondent stated that after the RPF attack, his group of Hutus dispersed.

On cross examination, Respondent testified that the group with whom he tried to enter Rwanda included individuals with guns. He said that he did not know if these individuals with guns were Army for the Liberation of Rwanda ("ALIR") or ex-FAR members. He also indicated that the group of people crossing into Rwanda included both Hutus and Tutsis.

Respondent added that following the attack by RPF soldiers in 1998, he found a group of ALIR soldiers whom he believed would protect him. He indicated that he had no choice but to join ALIR for his protection, but admitted that he was not forced to join the group. Respondent noted that when he first joined ALIR, he did not know what their mission was. When asked during cross examination why he had stated before the District Court that their mission was to "liberate the country," he stated that soldiers in Congo told him about this mission. He recalled that his first job with ALIR was to join a prayer group. In this group, he prayed, sang, foraged for food, and cooked in the service of the ALIR fighters. At that time, he lived in a house with a commander named Bemera. He said that he never saw any fighting associated with Mr. Bemera.

Respondent testified that he did not receive military training when he first joined ALIR. However, he was given a gun for a short period of time, and trained how to use, clean, and care for it. He related that during this training period, he never shot the gun because his ALIR unit did not have enough bullets. He noted that he never used the gun in any other way to harm a person.

Respondent indicated on direct examination that his ALIR unit never issued him another gun. He later stated on direct examination that he did not receive training in how to use an actual weapon at any time during his training, but in the symbolic "weapon" of survival and self-protection. During cross examination, Respondent stated that he never touched a gun when he was an ALIR member, but was merely shown in a group how to use a gun "once or twice."

Later on cross examination, Respondent testified that he carried a gun in ALIR on several occasions, but never possessed a single gun for longer than a single mission.

According to Respondent, he never advanced from his ALIR "first soldier" rank. He stated that ALIR trained him in its rules of behavior, and learned that he should never persecute any civilian, drink, or

otherwise misbehave. If he violated any of these rules, he faced 20 to 300 beatings—and possibly death, if he stole. He noted that he did not believe that ALIR intended to harm foreigners, and never heard that ALIR offered money to anyone who would kill the U.S. ambassador in Rwanda or that they planned to kidnap foreigners.

Respondent testified that he was told that he would become part of ALIR's Irondelle company in early 1999. An Irondelle captain approached him and took him into the company. Respondent said that he voluntarily went with this person. Respondent stated that he was part of a team, a larger section with more than fifty people, and a platoon. He indicates that he does not know how many people were in the Irondelle company.

Approximately a month and a few days later, he was told that he was supposed to walk with his section, in a single line, on a mission. He indicated that he never heard that his ALIR unit had planned to enter the Bwindi Impenetrable Forest ("Bwindi") in Congo at this time, or that ALIR aimed to capture or harm foreigners in Congo. Respondent added that he generally learned of news from fellow ALIR members who listened to the few radios that the group possessed. On his way to Bwindi, Respondent carried a gun.

Respondent related that when he entered Bwindi at approximately 6:00 a.m., he was asked to enter what looked like a restaurant or hotel with other soldiers and "take everything out of it." Other soldiers were ordered to enter other houses and buildings. He first stated that he stole food in the buildings to feed himself, but later testified that his commanders had told him to steal food and water at the time, and under their command he took fruits, plates, and every item he could carry out of the building. He said that this sort of stealing was acceptable to ALIR because he eventually turned over the items to his leaders. He stated that he saw no people in the house, and that when he arrived at Bwindi he saw no violent activities, but noted that he heard gunshots in the distance. When he came out of the house with food and other items, he saw a white people lining up. He indicated that he was told to take the goods he had gotten from the building and "go away." He added that he was part of one unit that went to Bwindi that day, and he later saw white people walk "when they were going back." Respondent recalled that after going to Bwindi, he returned to Congo with his unit. He heard on the radio that white people had been harmed by ALIR. He stated that he never personally harmed any person at Bwindi, and was not asked to harm anyone. He said that he later confessed to killing two white people because he was tortured.

Respondent stated that he renounced his ALIR membership in 2000. He did not believe that ALIR was a terrorist group at the time, but he was "not willing to be part" of that group any more. He said that he escaped ALIR by walking away on foot while he was on a security duty. He said that he had not escaped from ALIR earlier because he feared RPF soldiers and did not know where he was. At the time he left ALIR, he carried a weapon. Respondent indicated that he has never harmed a civilian in his life, and never helped or ordered anyone to harm any person. He added that he never saw any ALIR member harm a civilian, but he did see them protect civilians from harm by others.

Respondent noted that after he left ALIR, government agents in civilian clothes arrested him and put him in jail. Respondent stated that he surrendered his gun at this time, and asked to be taken to his home village. He learned that his captors were government agents by the way they talked on the phone and because they told him that they worked for the government. He stated that the government agents took him to a prison camp called Mweso. Soldiers in RPF uniforms took him to Mweso, where officers beat him, and denied him clothing and water. Respondent stayed at Mweso from six to eight months. He said that he heard gunshots and believed that the officers killed other Hutus. He notes that he believes that the officers detained and harmed him only because he was a Hutu, and not because they suspected he had been a part of ALIR.

Respondent added that after his release from Mweso, he spent six to eight months with his wife and son. Then government agents in plain clothes arrested and imprisoned him at Kakiru camp, and then transferred him to Kami. He stated that he testified to the District Court about his treatment at Kami camp. He said that all of the other prisoners he saw at Kami were Hutus, and he believes that the mistreatment he received at the camp resulted from his Hutu ethnicity and not from his activities with ALIR. He later testified on redirect examination that he believed that the authorities captured him and took him to Kami because he was a Hutu and an ex-ALIR member.

Respondent testified that he is now HIV-positive. He believes that he contracted the virus when medical officials gave him malaria vaccinations with tainted needles at Mweso and Kami. He added that once he saw a physician inject him with a needle that had blood in it. He states that he believes he will become ill and die in prison if he returns to Rwanda.

Respondent indicated that he believes U.S. authorities brought him to this country. He had no idea that the authorities were taking him to the United States until he arrived in Puerto Rico in 2003. He noted that when he arrived, he had no intention of returning to Rwanda because he did not believe Rwanda was safe, and he believed that he would receive justice in the United States. He said that between 2003 and 2006, he told his attorney that he had no intention to return to Rwanda.

According to Respondent, he has no intention to harm the United States. His wife and children still live in Rwanda, and he speaks with them over the phone. He stated that his family is having difficulties without his financial support, but he believes he cannot return to his country safely. He indicates that he believes that the authorities will kill him in prison if he returns to Rwanda because he is a Hutu. He adds that he believes he will be in danger if he returns because he has testified about the conditions in Rwanda before the District Court.

C.    *Witness Testimony—Mitchell Kiever*

Mr. Kiever testified that he is a Canadian citizen who currently lives in Washington, D.C. In early 1999, at the age of 24, he was a physical anthropologist and an employee of the University of Southern California who worked with a gorilla habituation program at the Bwindi National Park in Uganda. In January and

7

February 1999, he lived at the edge of the park, in a round cement hut with a thatched roof and shuttered windows, called a bonda. See Group Exhibit 8, Tab 11. Each bonda was approximately three to four meters in diameter.

Mr. Kiever stated that he slept alone in a bonda on February 28, 1999. Early the next morning, he awoke to a gunshot. He got out of bed, dressed, put his watch on, and then scrambled to turn off his clock radio as it went off at about 7:00 a.m. Mr. Kiever said that he heard other gunshots, the sounds of things being ransacked, and doors being kicked in . He said that it was unusual to hear gunshots near the park. He had heard gunshots from poachers near the park, but never experienced anything like this. He added that he looked out his door to the compound, and saw a person he did not recognize wearing a machine gun ammunition belt around his neck. He then closed his door, grabbed his money, and climbed under his bead. He could see feet walking by under the gap in his door. He heard people kicking in the bonda directly across from his. He knew that all bondas were empty but his. He then saw a set of feet stop in front of his door and kick it in. Meanwhile, he heard more gunshots from the park, and the sound of pots falling from a shelf. Within seconds, men pulled him from under his bed.

Mr. Kiever recalled that the men then took him outside to a concrete area near his bonda. The men, none of whom were in uniform, took his watch asked for his hiking shoes, and he gave them up. Then the men took him to a nearby dirt road. In French, the men asked him whether he was American or South African. He told the men that he was Canadian. He said that the men seemed very interested in his nationality.

Mr. Kiever added that he saw a single-file line of at least a dozen male and female foreigners, who were primarily white, down the road. He was the last person to join their group. The men made the group stand for a while and asked again for their nationalities. He saw a lot of people moving around in the background. He noticed that the men did not wear uniforms, but second-hand clothes. The men then took the group to a camp that had since abandoned, and then to a tourist camp. The men marched the group up the stairs to a camp, where Mr. Kiever saw small groups of people. The men sorted his group into the groups. He recalls seeing rebels moving to his right.

Mr. Kiever indicated that the men then walked his smaller group down the staircase to a dirt road, and then to a hiking trail through a virgin forest. His group walked in a single file, and it was difficult to see past his fellow captors to what happened in front of him. The trail became impenetrable, and the rebels led the group, cutting the trail with a machete. At one point, a soldier took Mr. Kiever's glasses from his face. At times, the rebels became aggressive and forceful.

Mr. Kiever related that the approximately 250 rebels led his group through the forest for a full day, through mountainous terrain. Sometimes he could see down a hill and noticed that the line extended for about 50 meters, with one person walking in each meter. Sometimes the group would stop and wait. At times, the group split off into smaller groups. His group, which thinned out to six people, eventually reached a clearing. The rebels then continued to march past them and left. A man in his group, Mark Rosso, told him that he had spoken with the rebels, and that they gave them permission to return to the camp.

8

According to Mr. Kiever, his group encountered the Ugandan army at some point. The army told his group that they had seen bodies on the path, whom Mr. Kiever later learned were fellow hostages. His group returned to their camp at approximately 6:30 p.n.. He noticed burned and otherwise destroyed property, and realized that the rebels had killed some of the park staff. See Group Exhibit 8, Tab 10. He also believed that some of the people he had worked with and befriended at his camp may have known about the plan to take him and other foreigners hostage.

Mr. Kiever testified that he did not recognize Respondent as one of his attackers.

D.   *Factual Findings in United States v. Karake*

The Court recognizes the following factual findings in United States v. Karake, 443 F.Supp. 2d.8, 12-19 (D.D.C. 2006).

The United States District Court for the District of Columbia notes that Respondent, along with Defendants Leonidas Bimenyimana and Gregoire Nyaminani, faced a four-count indictment relating to the March 1, 1999 killings of two American tourists in Bwindi Impenetrable National Forest ("Bwindi") in southwestern Uganda. Id at 12. ALIR carried out the attack, which also resulted in the deaths of several other tourists and one Ugandan national park guard. Id.

For much of the second half of the twentieth century, Rwanda was divided largely among ethnic lines between the Hutu, Tutsi, and Twa. Id. at 14. The Hutu majority assumed power in a series of elections in 1960-61 known as the "Hutu Revolution." Id. A group of Tutsi refugees, who had fled or been displaced from Rwanda, created the Rwandan Patriotic Front ("RPF"), which advocated the overthrow of Rwanda's Hutu regime. Id. The military wing of the RPF, known as the Rwandan Patriotic Army ("RPA"), invaded Rwanda in 1990. Id. From 1990 to 1994, divisions continued to grow within Rwanda between hard-line proponents of Hutu solidarity, on the one hand, and the Tutsi minority and moderate Hutus, on the other. Id.

On April 6, 1994, a plane carrying Rwandan President Juvenal Habyarimana was shot down outside Kigali. Responsibility for the assassination was never confirmed. Id. The death sparked a slaughter of the minority Tutsi population and Hutus who were considered sympathetic to the Tutsi. Id. Death estimates range from 800,000 to more than a million, and ended only with the RPA's defeat of the Hutu government in July 1994. Id.

In 1994, the FAR fled to the Democratic Republic of Congo ("DROC"), and became the ex-FAR. Id. at 15. The ex-FAR, with genocidal civilian gangs called the Interahamwe and other Hutu refugees, formed the ALIR. Id. The ALIR made repeated guerrilla-style incursions into Rwanda until at least 2001. Id.

The District Court also found that ALIR forces attacked Bwindi on March 1, 1999. Id. at 19. The ALIR unit responsible for the attack that day was Irondelle Company. Id. On the morning of the attack, several

9

groups of tourists, and approximately five Ugandan park rangers, were staying at various campsites within the park. Id. Seventeen tourists were taken hostage, including four Americans, six British, three New Zealanders, and one citizen each from Australia, Canada, Switzerland, and Uganda. Nine tourists survived, and eight were murdered. Id. at 20. Notes found with two murdered tourists, and testimony by surviving witnesses, indicates that ALIR targeted individuals whom they deemed "Anglophiles" or associated with the English or Americans. Id. at 19-20.

The Defendants moved to suppress the statements they made to Rwandan and American officials during the investigation into the Bwindi attack, while Respondent was housed at a military "barracks" known as Kami, outside of Kigali, Rwanda. Id. at 12. Kami also served as a detention center for Rwandan soldiers who were subject to disciplinary action. The District Court found that all three defendants in the case, including Respondent, suffered torture at Kami Camp. Specifically, their statements were "extracted only after countless hours of repetitive questioning over a period of many months," when they were "subjected to periods of solitary confinement, positional torture, and repeated physical abuse." Id. at 94. Based on the totality of the circumstances, the District Court found that "the conditions under which defendants were held at Kami and the abuse and mistreatment they endured while being interrogated shock the conscience and therefore render their statements involuntary and inadmissible." Id. at 85-86.

Specifically, Respondent's physician, Dr. Sondra S. Crosby, found that his body showed signs of lesions, head injuries, and leg scars consistent with "blunt trauma injury" and "scarring caused by shackles." Id. at 62-64. Dr. Crosby also testified that Respondent's descriptions of having been "slapped hard on his ears while at Kami Camp, which resulted in...ringing and buzzing in his ears," was consistent with a form of torture known as "telefono." Id. at 64. The District Court also noted non-physical evidence of torture at Kami camp, such as witness and U.S. government agency reports of abuse, torture, and other inhumane conditions at the camp. Id. at 69. Forced confessions, through torture, were common. Id. at 69-73. Based on this evidence, the District Court concluded that Respondent had been tortured and had not waived his rights before allegedly confessing his role in events at Bwindi. Id. at 94.

E.     *Suppressed Statements by Respondent During His Interrogation at Kami Camp*

The U.S. District Court for the District of Columbia granted Respondent's motion to suppress statements he made to Rwandan and American officials during the course of the investigation into the attack at Bwindi. This Court has not considered these statements in rendering its decision, unless otherwise indicated.

The suppressed statements indicated that after fleeing Rwanda in 1994, Respondent settled at a refugee camp in Kibumba, Congo. Id. at 16. He then spent much of the next year moving from camp to camp in the Congo, trying to avoid RPF attacks. Id. In 1997, Respondent met some ex-FAR soldiers, who had come to his refugee camp to train refugees to defend themselves against the RPF. Id. The training lasted approximately three months. Id. In 1998, Respondent attempted to return home to Rwanda after hearing radio announcements that he would be welcomed back. Id. Instead, the RPF attacked them. Id. At this point, Respondent joined ALIR, with the intent to overthrew the RPF government in Rwanda. Id.

Respondent was assigned to ALIR's Irondelle Company, and remained a "first soldier" with Irondelle until he returned to his family in Ruhengeri, Rwanda. Id. After his capture by RPF soldiers that year, he spent six to seven months at the Mweso RPF camp in Congo, and then transferred to a repatriation camp in Gisengi. Id. at 17. Respondent eventually was released from this camp and allowed to return home in April 2001, before his subsequent arrest by the RPF and detention at Kami Camp. Id.

While in detention at Kami Camp, Respondent indicated that he was ordered to kill three white men at Bwindi. Id. at 34. He stated that he was told not to use his gun, so he struck one man in the back of the head three times with the butt of an axe. Id. He then took the axe and killed the remaining victims, while they laid face-down on the ground. Id. at 37. He added that he saw his colleagues kill a fourth victim, but he was unsure whether it was a man or a woman. Id. at 34. At another time, Respondent confessed to killing "tourists." Id. at 36.

## F.    Documentary Evidence

In support of his application, Respondent submitted the following documentary evidence: Respondent's amended I-589 and supporting statements, filed with the Arlington Immigration Court on June 19, 2007. (Exhibit 2); his response to the DHS' motion to pretermit his application for relief (Exhibit 4); his motion to give collateral estoppel effect to the Federal District Court's findings and preclude the DHS from relitigating Respondent's past persecution, which the Court denied on November 6, 2007 (Group Exhibit 5); and his prehearing memorandum of law, containing Tabs A-M (Group Exhibit 7).

Group Exhibit 7 contains a copy of Karake, supra (Tab A); an affidavit by Sandra S. Crosby, M.D. (Tab B); and articles on Rwanda's political situation (Tabs C-E); the 2006 Department of State Country Report for Rwanda, dated March 6, 2007 (Tab F); the 2005 Department of State Country Report for Rwanda, dated March 8, 2006 (Tab G); the transcript for Karake, supra (Tab H); an affidavit by Michael Alan Grodin, M.D. (Tab I); a psychological evaluation by Judy B Okawa, Ph.D. (Tab J); an Amnesty International article on torture in Rwanda (Tab K); a CNN.com article on the Bwindi massacre (Tab L); and an Amnesty International article on extrajudicial executions at a Rwandan detention facility (Tab M).

In opposition to Respondent's application, the DHS submitted Respondent's Notice to Appear (Exhibit 1); a motion to pretermit Respondent's application for relief, which the Court denied on November 6, 2007 (Exhibit 3); the Government's opposition to Respondent's motion to preclude relitigation (Group Exhibit 6); the DHS' evidentiary submission, with Tabs 1-24 (Group Exhibit 8); and a U.S. Department of State comment on Respondent's case, dated July 20, 2007 (Exhibit 9).

Group Exhibit 8 contains Respondent's parole documents (Tab 1); U.S. Department of State Terrorist Exclusion List and 2002 Patterns of Global Terrorism (Tab 2); Respondent's form I-213 (Tab 3); docket sheets for Karake, supra (Tab 4); excerpts from books on Rwanda and the Bwindi massacre (Tabs 5-6); information on Bwindi massacre victims (Tab 7); Dateline's "Survivor's Story," dated August 10, 1999 (Tab 8); translated ALIR notes from the Bwindi massacre (Tab 9); photographs of Bwindi Impenetrable

Forest National Park after the March 1999 attack (Tab 10); a map of the Bwindi Impenetrable Forest (Tab 11); news and Internet articles on Rwanda's insurgency (Tabs 12-13, 18-24); the U.S. Department of State's 2004 Country Report on Terrorism (Tab 14); the 2006 Department of State Country Report for Rwanda, dated March 6, 2007 (Tab 15); USCIS Resource Information Center article on ALIR (Tab 16); and a December 2001 Human Rights Watch article on Rwanda (Tab 17).

The record also contains, and the Court has considered in its opinion, the Respondent's and Government's Closing Arguments, submitted on November 20, 2007.

## III. LEGAL ANALYSIS

### A.   Burdens of Proof

Generally, an individual who seeks to apply for relief from removal must establish that he or she satisfies the applicable eligibility requirements and merits a favorable exercise of discretion. INA § 240(c)(4)(A)(i)-(ii); 8 C.F.R. § 1240.8(d).

However, if the Government's evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the burden of proof shifts to the individual seeking the relief to establish, by a preponderance of the evidence, that such grounds are inapplicable. See 8 C.F.R. § 1240.8(d); Matter of S-K-, 23 I&N Dec. 936, 939 (BIA 2006); Matter of R-S-H-, 23 I&N Dec. 629, 640 (BIA 2003).

A mandatory bar to asylum and withholding relief applies to a respondent who has engaged in a terrorist activity; whom a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable grounds to believe, is engaged in or is likely to engage after entry in any terrorist activity; has, indicating an intention to cause death or serious bodily harm, incited terrorist activity; or is a representative of a terrorist organization or a political, social, or other group that endorses or espouses terrorist activity. 8 C.F.R. § 1208.13(c)(2)(ii)(F). This bar does not apply if there are no reasonable grounds to believe that the individual is a danger to the security of the United States. Id.

Asylum and withholding relief also is precluded to an individual who ordered, incited, assisted, or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 1208.13(c)(2)(i)(E). The mandatory bar also applies if there are reasonable grounds for regarding the alien as a danger to the security of the United States. 8 C.F.R. § 1208.13(c)(2)(i)(C). The applicant bears the burden of proving by a preponderance of the evidence that he did not commit either act if evidence indicated he did. 8 C.F.R. § 1208.13(c)(2)(ii).

12

*B.     Asylum*

*1.     One-Year Filing Deadline*

The Act specifies that the asylum applicant must demonstrate by clear and convincing evidence that he or she filed his or her application for asylum within one year of his or her arrival to the United States. INA § 208(a)(2)(B). If the application is filed after the one-year deadline, the burden of proof is on the applicant to establish to the satisfaction of the Immigration Judge that the circumstances were both beyond his or her control, and that but for those circumstances he or she would have filed within the one-year period. 8 C.F.R. § 1208.4.

*2.     Applicable Standards*

An alien requesting asylum bears the evidentiary burden of proof and persuasion in connection with any application under Section 208 of the Act. See INS v. Cardoza-Fonseca, 480 U.S. 421, 435 (1987); Matter of Mogharrabi, 19 I&N Dec. 439, 446 (BIA 1987); 8 C.F.R. § 1208.13(a); see also Matter of S-M-J-, 21 I&N Dec. 722 (BIA 1997); Matter of Acosta, 19 I&N Dec. 211, 215 (BIA 1985), modified on other grounds.

To qualify for a grant of asylum, an alien must credibly demonstrate that he or she is a "refugee" within the meaning of section 101(a)(42)(A) of the Act. INA § 208(b)(1); see also INA § 101(a)(42)(A); 8 C.F.R. § 1208.13(a). As such, the alien must demonstrate that the alleged persecution or well-founded fear of future persecution is "on account of his race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A). Additionally, the alien must establish that he or she is unable or unwilling to avail himself of the protection of the alien's country of nationality or last habitual residence. Id. His or her fear of persecution must be country-wide. See Matter of C-A-L-, 21 I&N Dec. 754 (BIA 1997); Matter of R-, 20 I&N Dec. 621 (BIA 1992); Matter of Acosta, 19 I&N Dec. 211, 235; see also Matter of Fuentes, 19 I&N Dec. 658 (BIA 1988). Finally, the alien must demonstrate that he or she is eligible for asylum as a matter of discretion. INA § 208(b)(1); see also Cardoza-Fonseca, 480 U.S. at 441.

*3.     Credibility*

In all applications for asylum, the Court must make a threshold determination of the alien's credibility. See Matter of O-D-, 21 I&N Dec. 1079 (BIA 1998); see also Matter of Pula, 19 I&N Dec. 467 (BIA 1987). An applicant's own testimony is sufficient to meet his or her burden of proving his or her asylum claim if it is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of his or her fear. See Matter of Dass, 20 I&N Dec. 120, 124 (BIA 1989); see also 8 C.F.R. § 1208.13(a). However, testimony is not considered credible when it is inconsistent, contradictory with current country conditions, or inherently improbable. See Matter of S-M-J-, 21 I&N Dec. at 730. While omissions of facts in an asylum application or during testimony alone might not, in themselves, support an

adverse credibility determination, the omission of key events coupled with numerous inconsistencies may provide a specific and cogent reason to support an adverse credibility finding. See Matter of A-S-, 21 I&N Dec. 1106 (BIA 1998).

The REAL ID Act of 2005[1] amended sections of the Immigration and Nationality Act relating to the adjudication of asylum applications. Pub. L. No. 109-13, Div. B, 119 Stat. 231 (2005). In making credibility determinations, courts consider the totality of the circumstances and all relevant factors. Courts may base a credibility determination on the Respondent's or witness's demeanor, candor, or responsiveness, and the inherent plausibility of the account. Other relevant factors include the consistency between written and oral statements (whenever made, whether or not under oath, and considering the circumstances under which such statements were made), the internal consistency of each statement with other evidence of record (including Department of State country reports), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the Respondent's claim. Courts also may consider any other factors relevant to credibility. INA § 208(b)(1)(B)(iii).

Further, even in cases when the Respondent does not testify credibly, an evaluation of the record as a whole is necessary to determine whether independent evidence establishes the Respondent's claim. See Camara v. Ashcroft, 378 F.3d 361 (4th Cir. 2004). An adverse credibility finding does not necessarily preclude a grant of asylum when an applicant presents independent evidence that substantiates that the applicant suffered past persecution, especially when there is no evidence to the contrary and the story is plausible. See id., at 370. However, the Fourth Circuit has clarified that affidavits from friends and family are not the independent evidence that Camara contemplates. Gandziami-Mickhou v. Gonzales, 445 F.3d 351 (4th Cir. 2006).

    *4.    Corroboration*

In determining whether an asylum applicant has met his or her burden of proof, the Board of Immigration Appeals ("BIA" or "Board") has recognized the difficulties that an alien may face in obtaining documentary or other evidence to support the alien's claim of persecution. See Matter of Dass, 20 I&N Dec. at 124-25. As such, unreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor). See Matter of S-M-J-, 21 I&N Dec. at 725-26. In fact, lack of corroborative evidence is not necessarily fatal to an asylum application, as uncorroborated testimony that is credible, persuasive, and specific may be sufficient to sustain the burden of proof to establish a claim for asylum. 8 C.F.R. § 1208.13(a); see also Matter of Mogharrabi, 19 I&N Dec. at 445.

---

[1] Congress enacted the REAL ID Act on May 11, 2005. The changes it made to immigration law apply to asylum applications filed on or after that date.

However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. See Matter of S-M-J-, 21 I&N Dec. at 725-26; see also Matter of M-D-, 21 I&N Dec. 1180 (BIA 1998). If such evidence is unavailable, the applicant must explain its unavailability, and the Immigration Judge must ensure that the applicant's explanation is included in the record. See Matter of S-M-J-, 21 I&N Dec. at 725-26. The absence of such corroboration can lead to a finding that an applicant has failed to meet his or her burden of proof. Id. at 725. Also, when evidence shows the country at issue has a reputation for persecuting persons similarly situated to the asylum applicant, that evidence requires careful consideration of the applicant's claims. Id. at 726.

5.   *Persecution*

The meaning of "persecution," as developed through United States case law, contemplates harm or suffering inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor seeks to overcome. See Matter of Acosta, 19 I&N Dec. at 223. Persecution within the meaning of the Act does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional. See Matter of V-T-S-, 21 I&N Dec. 792 (BIA 1997). Persecution is not limited to physical harm, but may include mental suffering or even economic deprivation so severe as to constitute a threat to an individual's freedom or life. See Matter of Acosta, 19 I&N Dec. at 222. Prosecution for violating laws of general applicability does not constitute persecution unless the punishment is imposed for invidious reasons or is grossly disproportionate to the proscribed conduct. Id.

a.   *Past Persecution*

An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she suffered persecution in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself of the protection of, that country owing to such persecution. 8 C.F.R. § 1208.13(b)(1). An applicant who is found to have established such past persecution shall also be presumed to have a well-founded fear of future persecution on the basis of the original claim. 8 C.F.R. § 1208.13(b)(1).

The regulatory presumption may be rebutted if the DHS establishes by a preponderance of the evidence that either: (1) there has been a fundamental change in circumstances[2] so that the applicant no longer has

---

[2] By adopting the language "fundamental change in circumstances" rather than requiring a showing of "changed country conditions" to overcome the presumption, other changes in the circumstances surrounding the asylum claim, including a fundamental change in personal circumstances may be considered, so long as those changes are fundamental in nature and go to the basis of the fear of persecution.

a well-founded fear of persecution in that applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of one of the enumerated grounds; or (2) the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under the circumstances, it would be reasonable to expect the applicant to do so. 8 C.F.R. § 1208.13(b)(1)(i), (ii). If the applicant's fear of persecution is unrelated to the past persecution, the applicant bears that burden of establishing that the fear is well-founded. 8 C.F.R. § 1208.13(b)(1).

### b.    Well-Founded Fear of Persecution

An applicant has a well-founded fear of persecution if: (1) the applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he or she was to return to that country; and (3) he or she is unable or unwilling to return to, or avail himself of the protection of, that country because of such fear. 8 C.F.R. § 1208.13(b)(2)(i). In general, the applicant's fear should be considered well founded if the applicant can establish, to a reasonable degree, that his or her continued stay in that country has become intolerable for the applicant on the basis of one of the enumerated grounds, or would for the same reasons, be intolerable if he or she returned there. See Handbook on Procedures and Criteria for Determining Refugee Status, Office of the United Nations High Commissioner for Refugees, ¶42, p. 12-13. (Geneva, January 1992). An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all circumstances it would be reasonable to expect the applicant to do so. 8 C.F.R. § 1208.13(b)(2)(ii).

To establish a well-founded fear of persecution, an applicant must present credible testimony that demonstrates that his or her fear of harm is of a level that amounts to persecution, that the harm is on account of a protected characteristic, that the persecutor could become aware or is already aware of the characteristic, and that the persecutor has the means and inclination to persecute. See Matter of Mogharrabi, 19 I&N Dec. at 446; see also Matter of Acosta, 19 I&N Dec. at 226. A well-founded fear of persecution must be both subjectively genuine and objectively reasonable. See Cardoza-Fonseca, 480 U.S. at 430-31. To demonstrate a subjective fear of persecution, an applicant must demonstrate a genuine apprehension of awareness of the risk of persecution. See Matter of Acosta, 19 I&N Dec. at 221. The objective component requires a showing by credible, direct, and specific evidence in the record that the alien's fear of persecution is reasonable. See DeValle v. INS, 901 F.2d 787, 790 (9th Cir. 1990).

### c.    On Account of

An applicant for asylum must demonstrate that he or she is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of his or her country because of persecution or a well-founded fear or persecution "on account of" race, religion, nationality, membership in a particular

social group, or political opinion. INA § 1208.13(b)(2)(i)(A). Even treatment that is regarded as "morally reprehensible" is not "persecution" withing the meaning of the Act unless it occurs "on account of" one of the five enumerated grounds in the Act. <u>See</u> <u>Matter of T-M-B-</u>, 21 I&N Dec. 775 (BIA 1997).

> 6.  *Discretion*

Statutory and regulatory eligibility for asylum, whether based on past persecution or a well-founded fear of future persecution, does not necessarily compel a grant of asylum. <u>See</u> <u>Cardoza-Fonseca</u>, 480 U.S. at 441. As applicant for asylum has the burden of establishing that the favorable exercise of discretion is warranted. <u>See</u> <u>Matter of Pula</u>, 19 I&N Dec. at 471; <u>see also</u> <u>Matter of Shirdel</u>, 19 I&N Dec. 33 (BIA 1984). In exercising discretion, it is appropriate to examine the totality of the circumstances and actions of an alien in his or her flight from the country where persecution is feared. <u>See</u> <u>Matter of Pula</u>, 19 I&N Dec. at 473. Courts also consider whether the alien found safe haven after leaving the country where she claimed past or future persecution. <u>See</u> <u>id.</u>

General humanitarian reasons, independent of the circumstances that led to the applicant's refugee status, such as his or her age, health, or family ties, should also be considered in the exercise of discretion. <u>Id.</u> at 474. Although the totality of the circumstances and actions of an alien in his or her flight from that country where persecution was suffered to the United States are to be considered and may weight against a favorable exercise of discretion, "the danger of persecution should generally outweigh all but the most egregious of adverse factors." <u>Id.</u> at 474.

The Board has also held that even if there is little likelihood of future persecution, an applicant may establish eligibility or asylum if he or she shows that he or she has suffered such severe past persecution on account of one or more of the enumerated grounds that it would be inhumane to return him to his or her country. <u>See</u> <u>Matter of Chen</u>, 20 I&N Dec. 16 (BIA 1989).

> C.  *Withholding of Removal Pursuant to INA § 241(b)(3)*

The burden of proof required to establish eligibility for asylum is lower than that required for withholding of removal, which requires the Respondent to show that it is "more likely than not" that he or she will be persecuted in Rwanda on account of a protected ground. 8 C.F.R. § 1208.16(b)(1); <u>see</u> <u>INS v. Stevic</u>, 467 U.S. 407 (1984); <u>see also</u> <u>INS v. Cardoza-Fonseca</u>, 480 U.S. at 463. Aliens convicted of a particularly serious crime are ineligible for withholding of removal. 8 C.F.R. § 1208.16(d)(2).

> D.  *Withholding and Deferral of Removal Under the Convention Against Torture*

An applicant for withholding or deferral of removal under the Torture Convention bears the burden of proving that it is "more likely than not" that he or she would be tortured if removed to the proposed country of removal. 8 C.F.R. §§ 1208.17; 1208.16(c)(2). As for withholding of removal under INA § 241(b), aliens convicted of a particularly serious crime are ineligible for withholding of removal under the CAT. <u>See</u>

8 C.F.R. § 1208.16(d)(2).

Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. § 1208.18(a)(1). Torture is an "extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman, or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). Additionally, to constitute torture, the "act must be directed against a person in the offender's custody or physical control." 8 C.F.R. § 1208.16(a)(6). Further, the pain or suffering must be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "Acquiescence of a public official" requires that the public official, "prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); see also Matter of S-V-, 22 I&N Dec. 1306 (BIA 2002).

The evidentiary burden can be sustained by testimony without corroboration if the testimony is credible. 8 C.F.R. § 1208.16(c)(2); 8 C.F.R. § 1208.13(a); see also Matter of Y-B-, 21 I&N Dec. 1136 (BIA 1998). In assessing whether an applicant has satisfied the burden of proof, the Court must consider all evidence relevant to the possibility of future torture, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where she is not likely to be tortured; evidence of gross, flagrant, or mass violations of human rights within the country of removal; and other relevant information regarding conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3). The Attorney General has held that protection under CAT cannot be established by stringing together a series of suppositions to show that it is more likely than not that torture will result where the evidence does not establish that each step in the hypothetical chain of events is more likely than not to occur. Matter of J-F-F-, 23 I&N Dec. 912 (A.G. 2006).

## IV. DISCUSSION

A.    *Applications for Asylum and Withholding of Removal under INA § 241(b)(3) and CAT*

The credibility and burden of proof provisions of the REAL ID Act of 2005 govern this case.

1.    *Credibility*

After viewing the totality of Respondent's record, the Court finds that Respondent is not a credible witness in regard to his role in ALIR and its attacks on civilians in 1999. The Court finds Respondent's claim of torture in 2002 by the RPF credible based on the District Court's decision. In assessing the credibility of his testimony, the Court has taken into account the plausibility and consistency of his account, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of his claim. See INA § 208(b)(1)(B)(iii).

18

An asylum applicant must establish the facts underlying his claim for relief by believable, consistent, and sufficiently detailed evidence that provides a plausible and coherent account of the basis of her fear. Testimony is not considered credible when it is inconsistent, contradictory with current country conditions, or inherently improbable. See Matter of S-M-J-, 21 I&N Dec. at 729. The Court finds that Respondent was not a credible witness in regard to several of his activities with ALIR.

Specifically, the Court finds Respondent's testimony relating to his role in ALIR atrocities not credible. Respondent asserted that when he fought with ALIR, he never harmed any civilians. He said that he saw "white people" lining up and walking at Bwindi on the day of their kidnapping, but was not aware of atrocities committed by ALIR against them. The Court finds this testimony inconsistent with other evidence on the record and implausible. See INA § 208(b)(1)(B)(iii). First, Respondent's claim that he did not know of atrocities committed by ALIR against civilians and foreigners at Bwindi on March 1, 1999 conflicts with evidence in the record demonstrating that his specific company in ALIR, Irondelle, carried out the Bwindi attacks on March 1, 1999. See Karake, supra at 19-20, Group Exhibit 4, Tabs 5-13.

Second, the Court finds Respondent's claim unreasonable because the information he admitted situates him at the scene of the massacre and indicates that he knew at least some details of the attack. Respondent testified that he was a first soldier of Irondelle, who followed his commander's instructions to loot restaurants or houses, steal all the items he could carry. He first stated that he stole the items to feed himself, but later admitted that he turned the goods over to ALIR. He added that he saw white people lining up and walking. This testimony places Respondent at Bwindi on the date of the massacre with the company of ALIR that murdered and raped the Bwindi victims. Respondent's acknowledgment that he saw white people line up and walk also indicates that he knew that ALIR had captured them and instructed them to line up and leave with the soldiers. Finally, Respondent's participation in the looting of property while armed supports the Government's claim that he actively played a role in the attack on Bwindi that day.

Third, Respondent's testimony about the events leading up to his membership in ALIR and the Bwindi attack was evasive and internally inconsistent. See INA § 208(b)(1)(B)(iii). When asked whether he knew whether Hutus participated in the Rwandan genocide, whether the group fleeing into Rwanda in 1998 consisted of Tutsis or Hutus, and how he joined ALIR, Respondent responded vaguely or refused to answer. He then related that no armed people lived with him at the refugee camps in Congo. He said that when he lived at the refugee camps, he did not have a weapon. He later testified on cross examination that ex-FAR members had trained him for two months in self-defense in 1997. He added that the ex-FAR soldiers had weapons at the time in the camp, but he was not taught to use the weapons. Respondent then stated that he had testified before the District Court that he trained with weapons, but that his reference to weapons at that court merely referred metaphorically to methods of self-protection. See Group Exhibit 7, Tab H, at 280-81, ¶¶ 19-21. He related that he "never touched a gun" until he joined ALIR.

Respondent additionally admitted that he stated before the District Court that his training with ex-FAR soldiers lasted three months, see Group Exhibit 7, Tab H, at 280, ¶ 4, but testified before this Court that the training lasted for only two months.

Moreover, Respondent stated that the RPF attacked his refugee camp in 1996 from a lake that was a 25-minute walk from the camp. Respondent later testified that the lake was only 10 meters from the camp.

Respondent further testified that the second attack at the camps by the RPF occurred when a soldier shot him in the hip while he held a child who was trying to feed on its mother. He later testified that this second attack occurred in 1997 when he went to an elderly man's house to juice bananas, and that the RPF soldiers detained him for approximately five to six hours, and held him with a machete. During cross examination, Respondent stated that the second attack occurred when the RPF destroyed his refugee camp, and that the RPF did not capture him.

Moreover, Respondent related that when he tried to cross into Rwanda in 1998, he and the other civilians had no guns. On cross examination, however, he testified that the group with whom he tried to enter Rwanda included individuals with guns.

Respondent also stated that when he joined ALIR in 1998, he did not know what their mission was. He admitted in cross examination, however, that he had stated before the District Court that their mission was to "liberate the country." See id. at 285, ¶¶ 8-10. He initially testified that ALIR did not provide training in how to use an actual weapon at any time during his training, but only trained him in the symbolic "weapon" of survival and self-protection. During cross examination, Respondent stated that he never touched a gun when he was an ALIR member, but was merely shown in a group how to use a gun "once or twice." Later on cross examination, Respondent testified that he carried a gun in ALIR on several occasions, including on his march to Bwindi.

Based on this inconsistent, evasive, and unreliable testimony, the Court finds that Respondent could not explain or substantiate his claim that he did not participate in any atrocities as a soldier. The Court thus finds Respondent's testimony regarding his participation in attacks by ALIR not credible. See § 208(b)(1)(B)(iii); see also Matter of S-M-J-, supra. Therefore, Respondent must submit corroborating evidence to support his claim that he did not participate in any atrocities against civilians or RPF soldiers while he was in ALIR. See Matter of S-M-J-, supra. Respondent provided no corroboration to bolster this claim.

The Court, however, finds other aspects of Respondent's testimony credible based on the District Court's findings. The evidence in the record independently supports Respondent's account of "torture" and other abuse by the RPF following his arrest in 2000. See Camara, supra; Matter of S-M-J-, supra. First, the Court accepts the 2006 findings by the District of Columbia District Court that Respondent endured "countless hours of repetitive questioning over a period of many months" when he was "subjected to

20

periods of solitary confinement, positional torture, and repeated physical abuse" that "shock the conscience." See Group Exhibit 5, Tab A, at 94.

Specifically, his physician found that his body showed signs of lesions, head injuries, and leg scars consistent with "blunt trauma injury" and "scarring caused by shackles." Id. at 62-64. His physician also testified that Respondent's descriptions of having been "slapped hard on his ears while at Kami Camp, which resulted in...ringing and buzzing in his ears," was consistent with a form of torture known as "telefono." Id. at 64.

Other evidence in the record further corroborates this finding. The 2006 State Department Country Report for Rwanda indicates "deplorable conditions" in government-run detention centers, where detainees are subject to beatings, inadequate food, water and medical care. See Group Exhibit 7, Tab F. The 2005 Country Report also reports the use of torture and excessive force by security forces and harsh prison and detention center conditions. See id., Tab G. Amnesty International further reports extrajudicial executions and "inhuman" and "degrading" treatment in military detention centers. See id., Tab K.

After considering the totality of his documentary record, the Court therefore finds that Respondent failed to provide a plausible and coherent account of his activities in ALIR. See Matter of Dass, 20 I&N Dec. 120, 124 (BIA 1989); see also 8 C.F.R. § 1208.13(a). Respondent's omission of key events, coupled with inconsistencies between the testimony he did submit and the record, provide a specific and cogent reason to support an adverse credibility finding. See Matter of A-S-, 21 I&N Dec. 1106 (BIA 1998). However, the Court finds Respondent's account of his torture by the RPF credible. See INA § 208(b)(1)(B)(iii).

The Court finds the Government's witness, Mr. Kiever, fully credible. As an eyewitness to the events at Bwindi on March 1, 1999, Mr. Kiever provided a detailed, specific, and coherent account of his experience as a hostage. See INS v. Elias-Zacarias, 502 U.S. 478 (1992) (requiring specific and detailed evidence to support a claim). Moreover, the details he provided directly correlate to the factual findings in Karake, supra at 19-20, that ALIR targeted English-speaking foreigners and killed several men and women whom they captured. Other evidence in the record further corroborates the details in Mr. Kiever's testimony, such as the photographs and maps from Bwindi and other witness accounts of the massacre. See Group Exhibit 8, Tabs 5-13.

   2.   One-Year Deadline

The Court finds that Respondent meets the one-year asylum application deadline. See INA § 208(a)(2)(B). Respondent was lawfully present in the United States until his parole was revoked, when the District of Columbia District Court dismissed his case on August 17, 2006. Respondent's entry date, for purposes of the one-year bar, thus began at this date. See INA § 212(d)(5) (noting that the parole of an alien shall not be regarded as an admission). He filed his asylum application with the DHS on December 29, 2006, less than five months after his parole was revoked. Therefore, the Court finds that Respondent filed his asylum application within the one-year deadline under INA § 208(a)(2)(B).

### 3. *Mandatory Bars to Asylum and Withholding of Removal*

The Court finds that three mandatory bars to asylum and withholding of removal apply to Respondent. First, Respondent engaged in terrorist activity, or represented a terrorist organization or a political, social, or other group that endorses or espouses terrorist activity. 8 C.F.R. § 1208.13(c)(2)(ii)(F). Second, Respondent ordered, incited, assisted, or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. §§ 1208.13(c)(2)(i)(E), 1208.16(d)(2). Third, there are reasonable grounds for regarding Respondent as a danger to the security of the United States. 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2).

Notwithstanding the fact that these removal proceedings are civil proceedings and not governed by evidentiary requirements of federal criminal law, under the theory of *res judicata*, the Court recognizes the suppression by the District of Columbia District Court in Karake, supra, of statements Respondent made to Rwandan and American officials during the course of the investigation into the attack at Bwindi. The Court will adopt the District Court's finding that "the conditions under which defendants were held at Kami and the abuse and mistreatment they endured while being interrogated shock the conscience and therefore render their statements involuntary and inadmissible." Id. at 85-86.

If some appellate body should reverse this Court's reliance on the District Court's findings, and deem these statements admissible, the Court would find the evidence shows that the terrorist bar applies to Respondent's case. See 1208.13(c)(2)(ii)(F). Respondent's active role as a "first soldier" in the Irondelle Company of ALIR, an organization that the State Department considers a terrorist group, also provides reasonable grounds for regarding Respondent as a person who engaged in terrorist activity, or represented a group that espouses such activity. See Group Exhibit 8, Tab 2; 1208.13(c)(2)(ii)(F). Moreover, Respondent admitted that after receiving orders from ALIR to kill Bwindi hostages, he murdered three white male "tourists" at Bwindi by striking them with the butt of an axe. See Karake, supra at 34-36. This act constitutes terrorist activity under the Act, as the use of a weapon "with intent to endanger...the safety of one or more individuals..." in a manner that is unlawful under the laws of the place where the act was committed. INA § 212(a)(3)(B)(iii).

The evidence also demonstrates that Respondent both participated in the persecution of others on account of race or nationality and that there are reasonable grounds for regarding him a danger to the security of the United States. See 8 C.F.R. § 1208.13(c)(2)(i)(E); 8 C.F.R. § 1208.13(c)(2)(i)(C). Specifically, Respondent admitted in these statements that he participated in the Bwindi attacks, which resulted in the murder of eight tourists, that ALIR targeted "Anglophile" tourists of English or American nationality in this attack. See Karake, supra at 23-41. This act constitutes the persecution of others on account of race or nationality. See 8 C.F.R. §§ 1208.13(c)(2)(i)(E), 1208.16(d)(2). Respondent's active participation in the murder of civilians in an organization that the State Department considers a terrorist group also provides reasonable grounds for regarding Respondent as a danger to the security of the United States. See Group Exhibit 8, Tab 2; 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2).

If, however, an appellate body upholds the Court's decision that the statements of the Respondent are inadmissible and suppresses the evidence, the Court still would find that these mandatory bars apply to Respondent for the following reasons:

> a.     *Respondent Bears the Burden of Proof to Demonstrate that the Mandatory Bars Do Not Apply*

In this case, Respondent, who seeks to apply for relief from removal, bears the burden of establishing that he satisfies the applicable eligibility requirements and merits a favorable exercise of discretion. INA § 240(c)(4)(A)(i)-(ii); 8 C.F.R. § 1240.8(d).

Further, the Government's evidence in this case indicates that grounds for mandatory denial of Respondent's application for relief may apply. Respondent testified that he had joined ALIR in 1998 and fought with ALIR against the RPF until 2000. Further, he stated that he was a first soldier in the Irondelle company, and that he accompanied his section to the Bwindi park in Uganda in early 1999. He added that he was ordered to enter what looked like a restaurant or hotel with other soldiers and "take everything out of it." He testified that his commanders had told him to steal food and water at the time, and he took fruits, plates, and every item he could carry out of the building. He said that he eventually turned over the items to his leaders. When he came out of the house with food and other items, he saw "white people" lining up. He later saw white people walking.

The record contains evidence that ALIR has been on the State Department's Terrorist Exclusion List since it was created in 2002. See Group Exhibit 8, Tab 2. Although the State Department Terrorist Exclusion List was not created until 2002 and the Respondent testified that he left ALIR in 2000, there is credible evidence in the record that ALIR committed terrorist acts while Respondent was a member. Specifically, the findings of fact in <u>Karake</u> relate that ALIR had kidnapped and murdered tourists in Bwindi on March 1, 1999 on the basis of their nationality. See <u>Karake</u>, <u>supra</u>, at 19-20. Such acts constitute terrorist activity under the Act. See INA § 212(a)(3)(B)(iii). This testimony and the findings in <u>Karake</u> also provide *prima facie* evidence that Respondent engaged in terrorist activity, or represented a terrorist organization or a political, social, or other group that endorses or espouses terrorist activity. 8 C.F.R. § 1208.13(c)(2)(ii)(F).

The Court also finds that the DHS provides *prima facie* evidence that Respondent, as an ALIR member, may have ordered, incited, or otherwise participated in the persecution of others on account of race or nationality; and that there are reasonable grounds for regarding Respondent, who had fought with a militia that the U.S. Government considers a terrorist organization, as a danger to the security of the United States. See 8 C.F.R. § 1208.13(c)(2)(i)(E);  8 C.F.R. § 1208.13(c)(2)(i)(C); 8 C.F.R. § 1208.16(d)(2). The burden thus shifts to Respondent to establish, by a preponderance of the evidence, that such grounds are inapplicable. See 8 C.F.R. § 1208.13(c)(2)(ii); 8 C.F.R. § 1240.8(d); <u>Matter of S-K-</u>, 23 I&N Dec. 936, 939 (BIA 2006); <u>Matter of R-S-H-</u>, 23 I&N Dec. 629, 640 (BIA 2003).

b.   *Respondent Is Unable to Establish that the Mandatory Bars Do Not Apply*

The Court finds that Respondent is unable to establish, by a preponderance of the evidence, that these mandatory bars to asylum and withholding of removal do not apply. See id. Respondent admitted in his testimony that he was a member of ALIR and participated in ALIR activities. He became a first soldier in ALIR who accompanied his section to the Bwindi park in Uganda once in early 1999. His commander ordered him to steal items from a restaurant or hotel with other soldiers and turn those items over to other ALIR leaders. Respondent further indicated that he when he came out of the house with food and other items, he saw "white people" lining up, and that he later saw white people walking.

Respondent also testified that he did not know of or participate in the atrocities in Bwindi. However, Respondent's membership in the Irondelle Company of ALIR, and his testimony that he was at the Bwindi park with Irondelle soldiers, looted items out of a restaurant or hotel, and saw white people situates him in the midst of these atrocities. See id.

Respondent provided no evidence, other than his testimony, to rebut the Government's documentation that ALIR is a terrorist organization, and its claim that as a member of ALIR's Irondelle company at Bwindi on March 1, 1999, Respondent engaged in terrorist activities. See 8 C.F.R. § 1208.13(c)(2)(ii)(F). The Court finds Respondent's testimony on this issue not credible. Respondent's assertion that he did not engage in the Bwindi attack directly conflicts with his testimony that he was a member of the Irondelle company, was in Bwindi on the date of the attack, looted a hotel or restaurant, and saw "white people" lining up and walking within that time frame. The testimony also conflicts with evidence that Respondent's Irondelle company carried out the Bwindi attacks that day, and that the attacks included looting and property damage, in which Respondent admitted participating. See Karake, supra at 19-20; Group Exhibit 8, Tabs 5-13. Therefore, Respondent fails to meet his burden of proof to demonstrate that the terrorist bar to asylum does not apply in this case. See 8 C.F.R. § 1208.13(c)(2)(ii)(F).

The record, including Mr. Kiever's witness testimony, also indicates that ALIR kidnapped, attacked, murdered, and raped tourists, whom ALIR had identified as "Anglophiles" or persons associated with the English or Americans. See Karake, supra at 19-20; Group Exhibit 8, Tabs 5-13. Respondent provided no credible evidence to establish, by a preponderance of the evidence, that he did not participate in these atrocities, and thus persecute others on account of race of nationality. See 8 C.F.R. §§ 1208.13(c)(2)(ii), 1208.13(c)(2)(i)(E), 1208.16(d)(2).

Respondent's admission that he was a member of ALIR suggests that he was a member of a terrorist organization, pursuant to the State Department's Terrorist Exclusion List. See Group Exhibit 8, Tab 2. The record also indicates that the U.S. government considers organizations on this list sources of violence and global insecurity. Id. Because Respondent merely protested, but did not provide evidence to rebut, the DHS' claim that he is a member of a group that the U.S. Government deems a terrorist organization, the Court finds that there remain reasonable grounds for considering him a danger to the security of the United States. See 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2). As such, he is ineligible for asylum,

withholding of removal under INA § 241(b)(3), and withholding of removal under the Convention Against Torture. See INA §§§ 208(b)(2)(A)(i), (iv), 241(b)(3)(B); 8 C.F.R. § 1208.16(d)(2).

4.    *Article 3 of the Torture Convention*

Deferral of removal under the Convention Against Torture may be available to an alien otherwise precluded from asylum or withholding of removal by a mandatory bar. See 8 C.F.R. §§ 1208.16(d)(2), 1208.17(a). The Court has found that three mandatory bars apply to Respondent—that he engaged in terrorist activity or was a representative of a terrorist organization or other group that endorses or espouses terrorist activity, that he participated in the persecution of others on account of race or nationality, and that there are reasonable grounds for regarding him a danger to the security of the United States. See 8 C.F.R. §§§ 1208.13(c)(2)(ii)(F), 1208.13(c)(2)(i)(E), § 1208.13(c)(2)(i)(C). As such, he is ineligible for withholding of removal under CAT, and the only available relief is deferral of removal. 8 C.F.R. § 1208.16(d)(2).

Respondent qualifies for deferral of removal under the Torture Convention. First, Respondent has established a credible fear of torture in Rwanda. The Court adopts the District of Columbia District Court's finding in Karake that Respondent suffered torture at Kami camp. Specifically, he endured "countless hours of repetitive questioning over a period of many months," when he was "subjected to periods of solitary confinement, positional torture, and repeated physical abuse," and the abuse and mistreatment he experienced at Kami "shock[s] the conscience." See Karake, supra at 85-86, 94. Evidence in the record indicates that Respondent suffered lesions, head injuries, and leg scars consistent with "blunt trauma injury" and "scarring caused by shackles." Id. at 62-64. His physician also related that Respondent's descriptions of having been "slapped hard on his ears while at Kami Camp, which resulted in...ringing and buzzing in his ears," was consistent with a form of torture known as "telefono." Id. at 64; see also Group Exhibit 5, Tab B.

The record also indicates that Respondent more likely than not, as a returning ex-ALIR prisoner under the RPF regime, will continue to endure similar treatment in Rwanda. The 2006 State Department Country Report for Rwanda indicates "deplorable conditions" in government-run detention centers, where detainees are subject to beatings, inadequate food, water and medical care. See Group Exhibit 7, Tab F, at 193. The 2005 Country Report also reports the use of torture and excessive force by security forces and harsh prison and detention center conditions. See Group Exhibit 7, Tab G, at 218. Amnesty International further reports extrajudicial executions and "harsh" and "cruel" treatment in military detention centers. See Group Exhibit 7, Tab K. The Court thus finds that Respondent, a prisoner considered an enemy of the current regime, faces a significant threat of physical force, beatings, and other serious abuse if he returns to Rwanda.

Second, Respondent demonstrates that this treatment he fears in Rwanda constitutes torture. Torture is defined as an "extreme form of cruel and inhuman treatment...by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. §§ 1208.18(a)(1), (2). The District of Columbia District Court had found that the treatment Respondent and his co-defendants in Karake

experienced in Rwanda constitutes torture. See Karake, supra at 85-86, 94. The District Court also noted witness and U.S. government agency reports of abuse, torture, and other inhumane conditions at the Kami detention center. Id. at 69. Forced confessions, through torture, were common, and reports of disappearances and extrajudicial killings persist. Id. at 69-73.

Third, Respondent has established that public officials in Rwanda would acquiesce in Respondent's torture. See Matter of S-V-, 22 I&N Dec. 1306 (BIA 2000). Kami Camp, along with other RPF-affiliated detention centers, are government-run facilities. See Karake, supra at 15. Moreover, the District Court notes that Respondent recently was under the supervision of Rwanda's Department of Military Intelligence ("DMI") at Kami Camp. See id. at 22 n.9. This information thus strongly suggests that Rwandan authorities, some of whom tortured Respondent while interrogating him, are aware of the use of torture in government-run facilities and breach their legal responsibility to intervene. 8 C.F.R. § 1208.18(a)(7); see also Matter of S-V-, supra.

Fourth, this case does not present a J-F-F- situation in which the applicant or the Immigration Judge postulate an unlikely string of suppositions in a futile attempt to create a probability out of a series of improbabilities. See Matter of J-F-F-, supra. This Respondent has provided corroborating documentation establishing that representatives of the current Rwandan government have a history of using torture against former ALIR members in prison, and that torture by the same authorities upon his return to Rwanda is probable, particularly since Respondent exposed the use of torture and other abuse by government officials at their military camps.

Moreover, in commenting on this case, the State Department provided no assurances that Respondent is not likely to be tortured in Rwanda. See 8 C.F.R. § 1208.18(f); Exhibit 9 Rather, it noted that the authorities would prosecute Respondent after he returns to Rwanda, and that Rwandan authorities have made "positive efforts" to improve prison and detention center conditions. See Exhibit 9. The letter vaguely indicated that reports of such treatment "have decreased," but also suggests that abuse and torture in Rwandan prisons still exist. See id. In the context of other evidence in the record that notes torture is common in government-run prisons, these efforts thus do not appear to alleviate the danger Respondent faces upon his return to Rwanda.

Therefore, the Court finds that Respondent has borne his burden to establish eligibility for deferral of removal under the Convention Against Torture by a preponderance of the evidence, and will grant his application for such relief.

Accordingly, after a careful review of the entire record, and for the reasons stated above, the Court enters the following order:

## ORDER

It Is Ordered that:

Respondent's application for asylum, pursuant to INA § 208(a), be **DENIED**.

It Is Further Ordered that:

Respondent be **REMOVED** to Rwanda pursuant to the charge in his Notice to Appear.

It Is Further Ordered that:

Respondent's application for withholding of removal to Rwanda, pursuant to INA § 241(b)(3), be **DENIED**.

It Is Further Ordered that:

Respondent's application for withholding of removal to Rwanda, pursuant to the Convention Against Torture, be **DENIED**.

It Is Further Ordered that:

Respondent's application for deferral of removal under Article 3 of the Convention Against Torture be **GRANTED**.

It Is Further Ordered that:

In accordance with 8 C.F.R. § 208.17(a), the respondent is hereby notified that deferral of removal: (1) does not confer any lawful permanent immigration status in the United States; (2) will not necessarily result in the respondent's release from DHS custody if the respondent is subject to DHS custody; (3) is effective only until terminated; (4) is subject to review and termination if an Immigration Judge determines that it is not likely that the respondent would be tortured in the country to which removal has been deferred or if the respondent requests that deferral be terminated; (5) applies only to the country in which it has been determined that the respondent is likely to be tortured and that the respondent may be removed at any time to another country where he is not likely to be tortured.

17-3-07
Date

Wayne R. Iskra
United States Immigration Judge