# EXHIBIT B

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
901 NORTH STUART ST., STE.1300
ARLINGTON, VA  22203


KIERSH, STEVEN R.
717 D STREET, NW, #400
WASHINGTON, DC  20004

IN THE MATTER OF              FILE A 79-187-168       DATE: Sep 27, 2007
NYAMINANI, GREGOIRE

___ UNABLE TO FORWARD - NO ADDRESS PROVIDED

X  ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE.  THIS DECISION
   IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
   WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
   SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
   YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
   MUST BE MAILED TO:      BOARD OF IMMIGRATION APPEALS
                          OFFICE OF THE CLERK
                          P.O. BOX 8530
                          FALLS CHURCH, VA  22041


___ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
   OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
   THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
   WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
   SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
   8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS.  IF YOU FILE A MOTION
   TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                          IMMIGRATION COURT
                          901 NORTH STUART ST., STE.1300
                          ARLINGTON, VA  22203

___ OTHER: _____

                          _____
                          COURT CLERK
                          IMMIGRATION COURT                      PF

     CC: DAVID ORLAND, DHS CHIEF COUNSEL
         901 N. STUART STREET, STE. 708
         ARLINGTON, VA,  22203

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
United States Immigration Court
901 North Stuart Street, Suite 1300
Arlington, Virginia 22203

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | IN REMOVAL PROCEEDINGS |
| | ) | |
| | ) | |
| NYAMINANI, Gregoire | ) | File No. :     A# 79-187-168 |
| | ) | |
| Respondent | ) | |
| | ) | |
| | ) | |

CHARGE:     Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA" or "Act"), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, other suitable travel document, or document of identity and nationality as required under INA § 211(a).

APPLICATIONS:     Asylum, pursuant to INA § 208(a);
Withholding of Removal, pursuant to INA § 241(b)(3);
Withholding of Removal, under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), pursuant to 8 C.F.R. § 1208.16 (2007); and
Deferral of Removal, under the CAT, pursuant to 8 C.F.R. § 1208.17.

<u>APPEARANCES</u>

**ON BEHALF OF RESPONDENT:**
Reita Pendry, Esq.
P.O. Box 480
Greenbelt, Maryland 20768

Steven R. Kiersh, Esq.
717 D Street, NW, Suite 400
Washington, DC 20004

**ON BEHALF OF THE DHS:**
Jo Ellen Ardinger, Esq.
Daniel I. Smulow, Esq.
Associate Legal Advisors
Department of Homeland Security
901 North Stuart Street, Suite 1307
Arlington, Virginia 22203

1

## DECISION AND ORDER

### I. PROCEDURAL HISTORY

Respondent is a 37-year-old male, and a native and citizen of Rwanda, who was paroled into the United States on March 2, 2003 at San Juan, Puerto Rico. The Department of Homeland Security alleges that his parole has expired or been revoked, and that Respondent does not possess a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document.

The Department of Homeland Security ("DHS") commenced removal proceedings against Respondent on February 27, 2007 by filing a Notice to Appear ("NTA") with the Court. The DHS charges Respondent as inadmissible pursuant to INA § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA" or "Act"), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, other suitable travel document, or document of identity and nationality as required under INA § 211(a).

At a hearing on March 6, 2007, Respondent, through counsel, conceded proper service of the NTA, admitted factual allegations (1) and (2), denied allegations (3) through (5), and denied the charge under INA § 212(a)(7)(A)(i)(I).

The Court upholds factual allegations (3) through (5). The record indicates that Respondent was paroled into the United States on March 2, 2003 to testify in United States v. Karake, et. al, 443 F.Supp.2d 8 (D.D.C. 2006). Respondent's parole expired at the end of the case in August 2006. At that time, Respondent was not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the INA. See INA § 212(a)(7)(A)(i)(I). This Court therefore finds Respondent's charge of removability to be sustained by clear and convincing evidence. See 8 C.F.R. § 1240.8(a).

On August 17, 2006, following an indictment charging Respondent and two other defendants with killing American tourists in the Bwindi Impenetrable National Forest ("Bwindi") on March 1, 1999, the United States District Court for the District of Columbia granted Respondent's joint motion to suppress statements made to Rwandan and United States officials, finding that the statements resulted from physical and psychological coercion and torture. See Karake, supra at 94.

As relief from removal, Respondent seeks to renew his application for asylum, initially filed on January 4, 2007. In the alternative, he seeks withholding of removal to Rwanda under INA § 241(b)(3), withholding of removal to Rwanda under the CAT pursuant to 8 C.F.R. § 1208.16, and deferral of removal to Rwanda under 8 C.F.R. § 1208.17.

2

For the reasons discussed below, the Court will deny Respondent's application for asylum, withholding of removal under INA § 241(b)(3), and withholding of removal under the CAT. The Court will grant Respondent's request for deferral of removal under the CAT.

## II. TESTIMONY AND EVIDENCE

### A.     Respondent's Asylum Application

Respondent initially filed his asylum application with the DHS on January 4, 2007. See Exhibit 2. In his application and accompanying statements, Respondent relates that he was born on April 1, 1970 in Byumba, Rwanda and is a Rwandan citizen and an ethnic Hutu.

Respondent notes that he served in the Rwandan military from 1992 to 1994, eventually attaining the rank of first sergeant. At one point, he served in Kigali. Rwandan government authorities later imprisoned him in Rwanda for allegedly being involved in a crime at the Bwindi Impenetrable Forest ("Bwindi"). The authorities tortured him at the Kami Camp in Kigali, Rwanda from February 2002 to March 2003. In March 2003, U.S. authorities paroled him into the United States, charged him with committing a crime at Bwindi, and incarcerated him in Washington, D.C. He recalls that the U.S. District Court issued an opinion in August 2006, finding that he was tortured in Rwanda.

Respondent adds that he believes the Rwandan authorities will torture or kill him if he returns to his country.

### B.     Respondent's Testimony

Respondent testified that he was born as an ethnic Hutu in Byumba, Rwanda in 1970. His family earned a living through farming, cultivating beans, peas, sorghum, potatoes, cassava, bananas, and coffee. His family's rural home had no electricity or water. Respondent stated that he attended school for seven and a half years, and worked as a farmer with his family in 1992.

Respondent added that he left his family in January 1992, at the age of 22, to attend a military academy affiliated with the Forces of the Rwandan Army ("FAR"), after the Rwandan Patriotic Front ("RPF") invaded Rwanda from Uganda. Respondent indicated that in the military academy, he learned to "fight the enemy" and use firearms. Respondent noted that the war broke out in his area, resulting in the massacre of Hutus. Respondent added that his family was not able to continue farming, and a lot of people he knew fled the country.

Respondent stated that he remained in the FAR military academy for six months. He became a FAR solder in 1992, and was promoted to the rank of first soldier by 1994. When he first left the military academy, FAR sent Respondent to fight at the front lines for 10 months. He carried a gun, which he used numerous times. He said that his section captured RPF soldiers and took them to headquarters. He did not personally question or harm the soldiers physically.

3

Respondent recalled that FAR stationed Respondent in Kigali as a military police officer in April 1994, as a reward for his long months of fighting and because he was one of the best soldiers on the front line. He related that he was in charge of protecting a food warehouse, and he took prisoners to headquarters. He noted that he did not carry a gun at first, but did later in April when the president's plane was shot down. He then left his post when fighting broke out and the RPF took Kigali. Respondent then fled to the Gitirama province, and then to the former Zaire (now Congo). He indicated that it took him two or three months to travel from Kigali to the Congo. He added that he fled with several soldiers and civilians, and that he used his gun against RPF soldiers only when necessary to protect his brother and his brother's wife. He was still a soldier at the time, and noted that the Congolese government took all of his weapons when he entered. He noted that his parents and other siblings were in Byumba at the time, and he does not know what became of these family members.

Respondent stated that he never was a member of the Interahamwe militia. Rather, he lived "like a villager" after moving to the Congo, in a camp with other Rwandans. He does not know who shared the camp with him, but assumed they were fellow Rwandan refugees. The camp was destroyed in 1996. Respondent then went to a different area of the Congo. He stated that he was not involved in any army between 1996 and 1998. Respondent testified that the RPF took him into custody twice during this period. He recalls two arrests in 1997, at the beginning and the end of the year. During the first arrest, the RPF held him for 10 days and tortured him because he was a Hutu. He said that he was a civilian at the time, and carried no weapons. He escaped by cutting through the top of a house where he was held. The second arrest occurred after he assembled with other refugees. The RPF detained him for one day, after which an army that was attacking the RPF rescued him.

Respondent related that he rejoined the military in 1998, once he reentered Rwanda. This time, he joined the Army for the Liberation of Rwanda ("ALIR"). Respondent noted that after joining ALIR, he held a gun for the first time since he surrendered his weapons in the Congo in 1994. He said that his arrest by the RPF prompted him to join the group, and believed that the group would help promote peace in Rwanda. Because he had experience as a first officer in the FAR, he entered ALIR as a first officer, with the responsibility of supervising other soldiers. Respondent added that he served under a captain, who commanded the group "01." Group 01 was subdivided into a battalion, headed by a lieutenant. Each battalion contained three companies. His battalion's companies were named after birds: Irondelle, Lievre, and Pigeion. Respondent stated that he was a member of the Irondelle company. Each company contained three platoons, subdivided into four sections, with approximately 11 soldiers. Respondent was in the third platoon, and became the leader of his section after the former section leader was injured. Respondent noted that as section leader, he received his orders from his platoon leader, who received orders from the head of the Irondelle company, who, in turn, received orders from the battalion leader.

Respondent added that his platoon chief never informed him that the United States had classified his army in any way, or that his section had any connection to a place called Virunga.

4

Respondent related he does not remember how many missions he fought between 1998 and 2001. He noted that he accompanied his section to Uganda once between January and March 1999. Over the radio, he learned that he was going to go to an area called Bwindi. The commander of his company informed his platoon chief of the plan, and his platoon chief told Respondent that his section had a job to do. At approximately 2:00 a.m., Respondent learned that he was going to attack soldiers because Uganda and Rwanda were fighting his army. He walked through the night and the next day with the other ALIR soldiers, and prepared to fight a platoon of RPF soldiers. He recognized the RPF soldiers because they wore uniforms. His army, however, did not wear any particular uniform. He added that the soldiers his section was supposed to fight attacked them first, and then his group retaliated, driving the other soldiers back.

Respondent testified that his platoon chief ordered him to create a roadblock, to keep people from "coming back." The roadblock was his only responsibility. He saw no white people "fighting." The platoon chief then told him to leave the roadblock, and go to another area where people were fighting. Respondent's section caught up with another ALIR section, and proceeded to the front of the line to help tend to injured ALIR soldiers. He said that he and the other soldiers passed by some civilian homes. He added that he saw approximately four white people talking to the company head, but avoided them and kept going. He was told not to stop when he saw them. He said that he did not know English, and did not receive instructions from the commander relating to the white people he saw. According to Respondent, he saw no burning cars or buildings.

Respondent added that when he returned through the bush with his soldiers, he saw soldiers with white people in one place. He noted that he was not ordered to physically harm them, and that he was not present when anyone else harmed them. He said that he did not know why they were taken with his group when the left the site of the attack. Respondent added that he returned to the Congo that same day, and all but one of his wounded fellow soldiers survived. Respondent related that he never used a machete or axe when he fought with ALIR, and only saw fellow ALIR members using guns. ALIR members did carry machetes or axes, however, to cut wood or other plants.

Respondent indicated that in July or August 1999, he became a sergeant, the head of his platoon. As a platoon leader, he received no pay or uniforms, but carried weapons. Respondent indicated that he remained in ALIR until the RPF captured him in 2001 in Rwanda. He remained in RPF custody for one month. Since that date, he has not been involved in any military organization. He said that no one accused him of any wrongdoing when he was in custody.

Respondent testified that when he fought with FAR and ALIR, he never harmed any civilians. He added that he has seen RPF kill civilians on several occasions. He indicated that as a soldier, he always was fleeing the RPF. When he was in ALIR, he and his fellow soldiers slept in the bush, after making their own shelter. They had no access to televisions or newspapers.

5

Nov 19 07 10:18a    Reita Pendry    301-345-2393    p.11

Respondent testified that he fears returning to Rwanda. He believes that the military will arrest him because he is a Hutu who had been a member of ALIR. He also fears retribution for statements he made about Rwanda during his U.S. District Court hearing in 2006.

## C.    Witness Testimony—Mitchell Kiever

Mr. Kiever testified that he is a Canadian citizen who currently lives in Washington, D.C. In early 1999, at the age of 24, he was a physical anthropologist and an employee of the University of Southern California who worked with a gorilla habituation program at the Bwindi National Park in Uganda. He later worked with the African Wildlife Foundation. In January and February 1999, he lived at the park, in a round cement hut with a thatched roof and shuttered windows, called a bonda. See Group Exhibit 7, Tab 11. Each bonda was approximately three to four meters in diameter and contained bunkbeds.

Mr. Kiever stated that he slept alone in a bonda on February 28, 1999. Early the next morning, he awoke to a gunshot. He got out of bed, dressed, put his watch on, and then scrambled to turn off his clock radio as it went off at about 7:00 a.m. Mr. Kiever said that he heard other gunshots, the sounds of things being ransacked, and doors being kicked in . He said that it was unusual to hear gunshots near the park. He had sometimes seen the Ugandan army near his camp, but never experienced anything like this. He added that he looked out his door to the compound, and saw a person he did not recognize wearing a machine gun ammunition belt around his neck. He then closed his door, grabbed his money, and climbed under his bead. He could see feet walking by under the gap in his door. He heard people kicking in the bonda directly across from his. He knew that all bondas were empty but his. He then saw a set of feet stop in front of his door, and kick it in. Meanwhile, he heard more gunshots from the park, and the sound of pots falling from a shelf. Within seconds, men pulled him from under his bed and took his pouch of money from his hands.

Mr. Kiever recalled that the men then took him outside to a concrete area near his bonda. The men asked for his hiking shoes, and he gave them up. Then the men took him to a nearby dirt road 10 meters away. In French, the men asked him if he was American or South African. He told the men that he was Canadian. He said that the men seemed very interested in his nationality.

Mr. Kiever added that he saw a single-file line of at least a dozen male and female foreigners, who were primarily white, down the road. He was the last person to join their group. The men made the group stand for a while and asked again for their nationalities. He saw a lot of people moving around in the background. He noticed that the men did not wear uniforms, but second-hand clothes. One man wore an NBA t-shirt. The men then took the group to a camp where Peace Corps workers used to live, and had since abandoned, and then to a tourist camp. The men marched the group up the stairs to a camp, where Mr. Kiever saw small groups of people. The men sorted his group into the groups. Respondent remembers standing near a French diplomat and other people, and remembered three people behind him. He recalls seeing rebels moving to his right. One rebel took a bottle of alcohol forcibly and smashed it.

6

Mr. Kiever indicated that the men then walked his smaller group down the staircase to a dirt road, and then to a hiking trail through the forest that was popular with birders. His group walked in a single file, and it was difficult to see past his fellow captors to what happened in front of him. He was afraid to turn around and see what he left behind. The trail became impenetrable, and the rebels led the group, cutting the trail with a machete. Mr. Kiever, who was barefoot, noticed that some foreigners were missing clothing, and he remembered seeing a man in boxer suits. The foreigners seemed calm. At one point, a soldier took Mr. Kiever's glasses from his face.

Mr. Kiever related that the rebels led his group through the forest for a full day, through mountainous terrain. He believed that they walked west toward the Ugandan border toward the Congo, which was approximately three kilometers from the camp. Sometimes he could see down a hill, and noticed that the line extended for about 50 meters, with one person walking in each meter. Sometimes the group would stop and wait. At times, the group split off into smaller groups. He saw two men seated at one point, and passed them. He later learned that the rebels murdered those men. He also remembers seeing the rebels grab a woman. His group thinned out to six people, all of whom spoke English. Eventually the group reached a clearing, and sat in a horseshoe shape. The rebels continued to march past them, and then left. A man in Mr. Kiever's group, Mark Rosso, told him that he had spoken with the rebels, and that they gave them permission to return to the map.

According to Mr. Kiever, his group eventually encountered the Ugandan army. The army told his group that they had seen bodies on the path, whom Mr. Kiever later learned were fellow hostages. His group returned to their camp. He noticed that his car had been burned, and that the rebels had killed some of the park staff. See Group Exhibit, Tab 10. He also realized that some of the people he had worked with and befriended at his camp may have known about the plan to take him and other foreigners hostage, and he felt betrayed by them.

D.    Factual Findings in United States v. Karake

The Court recognizes the following factual findings in Karake, supra:

The United States District Court for the District of Columbia notes that Respondent, along with Defendants Francois Karake and Leonidas Bimenyimana, faced a four-count indictment relating to the March 1, 1999 killings of two American tourists in Bwindi Impenetrable National Forest ("Bwindi") in southwestern Uganda. Id at 12. ALIR carried out the attack, which also resulted in the deaths of several other tourists and one Ugandan national park guard. Id.

For much of the second half of the twentieth century, Rwanda was divided largely among ethnic lines between the Hutu, Tutsi, and Twa. Id. at 14. The Hutu majority assumed power in a series of elections in 1960-61 known as the "Hutu Revolution." Id. A group of Tutsi refugees, who had fled or been displaced from Rwanda, created the Rwandan Patriotic Front ("RPF"), which advocated the overthrow of Rwanda's Hutu regime. Id. The military wing of the RPF, known as the Rwandan Patriotic Army

7

("RPA"), invaded Rwanda in 1990. Id. From 1990 to 1994, divisions continued to grow within Rwanda between hard-line proponents of Hutu solidarity, on the one hand, and the Tutsi minority and moderate Hutus, on the other. Id.

On April 6, 1994, a plane carrying Rwandan President Juvenal Habyarimana was shot down outside Kigali. Responsibility for the assassination was never confirmed. Id. The death sparked a slaughter of the minority Tutsi population and Hutus who were considered sympathetic to the Tutsi. Id. Death estimates range from 800,000 to more than a million, and ended only with the RPA's defeat of the Hutu government in July 1994. Id.

In 1994, the FAR fled to the Democratic Republic of Congo ("DROC"), and became the ex-FAR. Id. at 15. The ex-FAR, with genocidal civilian gangs called the Interahamwe and other Hutu refugees, formed the ALIR. Id. The ALIR made repeated guerrilla-style incursions into Rwanda until at least 2001. Id.

The District Court also found that ALIR forces attacked Bwindi on March 1, 1999. Id. at 19. The ALIR unit responsible for the attack that day was Irondelle Company. Id. On the morning of the attack, several groups of tourists, and approximately five Ugandan park rangers, were staying at various campsites within the park. Id. Seventeen tourists were taken hostage, including four Americans, six British, three New Zealanders, and one citizen each from Australia, Canada, Switzerland, and Uganda. Nine tourists survived, and eight were murdered. Id. at 20. Notes found with two murdered tourists, and testimony by surviving witnesses, indicates that ALIR targeted individuals whom they deemed "Anglophiles" or associated with the English or Americans. Id. at 19-20.

The Defendants moved to suppress the statements they made to Rwandan and American officials during the investigation into the Bwindi attack, while Respondent was housed at a military "barracks" known as Kami, outside of Kigali, Rwanda. Id. at 12. Kami also served as a detention center for Rwandan soldiers who were subject to disciplinary action. The District Court found that all three defendants in the case, including Respondent, suffered torture at Kami Camp. Specifically, their statements were "extracted only after countless hours of repetitive questioning over a period of many months," when they were "subjected to periods of solitary confinement, positional torture, and repeated physical abuse." Id. at 94. Based on the totality of the circumstances, the District Court found that "the conditions under which defendants were held at Kami and the abuse and mistreatment they endured while being interrogated shock the conscience and therefore render their statements involuntary and inadmissible." Id. at 85-86.

Specifically, Respondent's physician, Dr. Arden, found that his body showed signs of "patterned scars" on his extremities consistent with his reports of tight, shackled binding. Id. at 65. Dr. Arden also noted "irregular scarring" that was consistent with Respondent's explanation that his ankle had become infected after being cut by the shackle. Id. Further, he observed "multiple separate incisions" that "could not be 'the result of random impact or a single cut,' that 'are highly consistent with [the] specific torture scenarios that he described.'" Id. Based on this evidence, the District Court concluded that Respondent had been tortured and had not waived his rights before allegedly confessing his role in events at Bwindi. Id. at 94.

8

E.      *Suppressed Statements by Respondent During His Interrogation at Kami Camp*

The U.S. District Court for the District of Columbia granted Respondent's motion to suppress statements he made to Rwandan and American officials during the course of the investigation into the attack at Bwindi. This Court has not considered these statements in rendering its decision, unless otherwise indicated.

The suppressed statements indicated that Respondent joined the FAR in 1992, and was sent to the front lines to fight RPA insurgents after three months of training. Id. at 17. During his 10 months at the front, he witnessed numerous atrocities committed by the RPA against civilians. Id. After completing his tour of duty at the front, Respondent returned to Kigali in late 1993 and was assigned to a military police unit that guarded the country's crop storage. Id. He continued this assignment until he fled the advancing RPA in 1994. Id.

Respondent settled at a refugee camp in the Democratic Republic of Congo. Id. In 1996, the RPA destroyed the camp with bombs. Id. He then fled with other refugees into the Congolese jungle, where he witnessed further atrocities by the RPA against the refugees. Id. The RPA captured Respondent twice between 1996 and 1998. Id. In 1997, the RPA took him to a 1 meter by 1.2 meter enclosure. Id. The RPA tied him up and beat him. Id. Respondent managed to escape. Id. The RPA captured him a second time after he failed to return to Rwanda. Id. He escaped after colleagues with a gun scared off the guards. Id.

Respondent joined ALIR in 1998, and was assigned to the Irondelle company. Id. He remained a member of ALIR, attaining the rank of first sergeant, until his capture by the RPA in battle on June 15, 2001. Id.

Respondent indicated that he knew of the attacks at Bwindi, and named several ALIR members who participated. Id. at 23. He said that he admitted to seeing other soldiers return from Bwindi with "bags" containing goods from the hostages. Id. He claimed to have stayed at the edge of the park rather than entering the area where hostages were taken. Id. Respondent later related that he "assisted with the murder of a white male and white female." Id. at 35-37. He stood watch with his gun to ensure the tourists did not escape while his colleague beat them to death with a wooden club. Id. He also stated that he raped one woman and "oversaw" her murder, and witnessed his colleagues raping other women. Id. He noted that ALIR had targeted supporters of the Rwandan government, such as Americans and the British. Id. at 41. He believed that all three female victims killed by his soldiers were American. Id.

D.      *Documentary Evidence*

The record contains the following evidence: Respondent's Notice to Appear (Exhibit 1); his I-589, initially submitted to the DHS on January 4, 2007 (Exhibit 2); the Government's motion to pretermit Respondent's application for asylum, which the Court denied on July 24, 2007 (Exhibit 3); Respondent's motion to terminate, which the Court denied on July 24, 2007 (Exhibit 4); the Government's opposition to the motion

9

to terminate (Exhibit 5); Respondent's brief in support of his application for asylum and other relief from removal, including a copy of United States v. Karake, et al., supra (Exhibit 6); the Government's evidentiary submissions, with Tabs 1025 (Group Exhibit 7); a Department of State comment letter (Exhibit 8); and Respondent's supplementary exhibit package, dated August 2, 2007 (Group Exhibit 9).

Group Exhibit 7 contains Respondent's parole documents (Tab 1); the Department of State's Terrorist Exclusion List and Patterns of Global Terrorism (Tab 2); Respondent's record of deportable/inadmissible alien (Tab 3); docket sheets for United States v. Karake, et al., supra (Tab 4); excerpts from "In the Aftermath of Genocide" by Robert E. Gribbin (Tab 5); excerpts from "Dangerous Beauty" by Mark C. Ross (Tab 6); information regarding tourist victims at Bwindi (Tab 7); a transcript from Dateline-NBC, dated August 10, 1999 (Tab 8); ALIR notes from the Bwindi massacre (Tab 9); photographs and a map from Bwindi (Tabs 9-10); excerpts from books and reports on Bwindi (Tabs 12-13); the Department of State's 2004 Country Report on Terrorism (Tab 14); the 2006 Department of State Country Report for Rwanda (Tab 15); a USCIS Resource Information Center article on ALIR (Tab 16); news articles and country reports on Bwindi (Tabs 17-21, 23-24); ALIR political cartoons (Tab 22); and the transcript for United States v. Karake, et al, supra (Tab 25)

Group Exhibit 9 contains a report by Filip Reyntjens and 2004 and 2005 Amnesty International Reports on Rwanda.

### III.  LEGAL ANALYSIS

#### A.    Burdens of Proof

Generally, an individual who seeks to apply for relief from removal must establish that he or she satisfies the applicable eligibility requirements and merits a favorable exercise of discretion. INA § 240(c)(4)(A)(i)-(ii); 8 C.F.R. § 1240.8(d).

However, if the Government's evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the burden of proof shifts to the individual seeking the relief to establish, by a preponderance of the evidence, that such grounds are inapplicable. See 8 C.F.R. § 1240.8(d); Matter of S-K-, 23 I&N Dec. 936, 939 (BIA 2006); Matter of R-S-H-, 23 I&N Dec. 629, 640 (BIA 2003).

Asylum and withholding relief is mandatorily precluded to an individual who ordered, incited, assisted, or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. §§ 1208.13(c)(2)(i)(E), 1208.16(d)(2). The mandatory bar also applies if there are reasonable grounds for regarding the alien as a danger to the security of the United States. 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2). The applicant bears the burden of proving by a preponderance of the evidence that he did not commit either act if evidence indicated he did.  8 C.F.R. § 1208.13(c)(2)(ii).

10

The asylum bar also applies to Respondents who have engaged in a terrorist activity; whom a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable grounds to believe, is engaged in or is likely to engage after entry in any terrorist activity; have, indicating an intention to cause death or serious bodily harm, incited terrorist activity; or is a representative of a terrorist organization or a political, social, or other group that endorses or espouses terrorist activity. 8 C.F.R. § 1208.13(c)(2)(ii)(F). This bar does not apply if there are no reasonable grounds to believe that the individual is a danger to the security of the United States. Id.

*B.    Asylum*

*1.    One-Year Filing Deadline*

The Act specifies that the asylum applicant must demonstrate by clear and convincing evidence that he or she filed his or her application for asylum within one year of his or her arrival to the United States. INA § 208(a)(2)(B). If the application is filed after the one-year deadline, the burden of proof is on the applicant to establish to the satisfaction of the Immigration Judge that the circumstances were both beyond his or her control, and that but for those circumstances he or she would have filed within the one-year period. 8 C.F.R. § 1208.4.

*2.    Applicable Standards*

An alien requesting asylum bears the evidentiary burden of proof and persuasion in connection with any application under Section 208 of the Act. See INS v. Cardoza-Fonseca, 480 U.S. 421, 435 (1987); Matter of Mogharrabi, 19 I&N Dec. 439, 446 (BIA 1987); 8 C.F.R. § 1208.13(a); see also Matter of S-M-J-, 21 I&N Dec. 722 (BIA 1997); Matter of Acosta, 19 I&N Dec. 211, 215 (BIA 1985), modified on other grounds.

To qualify for a grant of asylum, an alien must credibly demonstrate that he or she is a "refugee" within the meaning of section 101(a)(42)(A) of the Act. INA § 208(b)(1); see also INA § 101(a)(42)(A); 8 C.F.R. § 1208.13(a). As such, the alien must demonstrate that the alleged persecution or well-founded fear of future persecution is "on account of his race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A). Additionally, the alien must establish that he or she is unable or unwilling to avail himself of the protection of the alien's country of nationality or last habitual residence. Id. His or her fear of persecution must be country-wide. See Matter of C-A-L-, 21 I&N Dec. 754 (BIA 1997); Matter of R-, 20 I&N Dec. 621 (BIA 1992); Matter of Acosta, 19 I&N Dec. 211, 235; see also Matter of Fuentes, 19 I&N Dec. 658 (BIA 1988). Finally, the alien must demonstrate that he or she is eligible for asylum as a matter of discretion. INA § 208(b)(1); see also Cardoza-Fonseca, 480 U.S. at 441.

11

### 3.    Credibility

In all applications for asylum, the Court must make a threshold determination of the alien's credibility. See Matter of O-D-, 21 I&N Dec. 1079 (BIA 1998); see also Matter of Pula, 19 I&N Dec. 467 (BIA 1987). An applicant's own testimony is sufficient to meet his or her burden of proving his or her asylum claim if it is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of his or her fear. See Matter of Dass, 20 I&N Dec. 120, 124 (BIA 1989); see also 8 C.F.R. § 1208.13(a). However, testimony is not considered credible when it is inconsistent, contradictory with current country conditions, or inherently improbable. See Matter of S-M-J-, 21 I&N Dec. at 730. While omissions of facts in an asylum application or during testimony alone might not, in themselves, support an adverse credibility determination, the omission of key events coupled with numerous inconsistencies may provide a specific and cogent reason to support an adverse credibility finding. See Matter of A-S-, 21 I&N Dec. 1106 (BIA 1998).

The REAL ID Act of 2005[1] amended sections of the Immigration and Nationality Act relating to the adjudication of asylum applications. Pub. L. No. 109-13, Div. B, 119 Stat. 231 (2005). In making credibility determinations, courts consider the totality of the circumstances and all relevant factors. Courts may base a credibility determination on the Respondent's or witness's demeanor, candor, or responsiveness, and the inherent plausibility of the account. Other relevant factors include the consistency between written and oral statements (whenever made, whether or not under oath, and considering the circumstances under which such statements were made), the internal consistency of each statement with other evidence of record (including Department of State country reports), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the Respondent's claim. Courts also may consider any other factors relevant to credibility. INA § 208(b)(1)(B)(iii).

Further, even in cases when the Respondent does not testify credibly, an evaluation of the record as a whole is necessary to determine whether independent evidence establishes the Respondent's claim. See Camara v. Ashcroft, 378 F.3d 361 (4th Cir. 2004). An adverse credibility finding does not necessarily preclude a grant of asylum when an applicant presents independent evidence that substantiates that the applicant suffered past persecution, especially when there is no evidence to the contrary and the story is plausible. See id., at 370. However, the Fourth Circuit has clarified that affidavits from friends and family are not the independent evidence that Camara contemplates. Gandziami-Mickhou v. Gonzales, 445 F.3d 351 (4th Cir. 2006).

---

[1] Congress enacted the REAL ID Act on May 11, 2005. The changes it made to immigration law apply to asylum applications filed on or after that date.

12

4.     *Corroboration*

In determining whether an asylum applicant has met his or her burden of proof, the Board of Immigration Appeals ("BIA" or "Board") has recognized the difficulties that an alien may face in obtaining documentary or other evidence to support the alien's claim of persecution. See Matter of Dass, 20 I&N Dec. at 124-25.  As such, unreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor). See Matter of S-M-J-, 21 I&N Dec. at 725-26.  In fact, lack of corroborative evidence is not necessarily fatal to an asylum application, as uncorroborated testimony that is credible, persuasive, and specific may be sufficient to sustain the burden of proof to establish a claim for asylum. 8 C.F.R. § 1208.13(a); see also Matter of Mogharrabi, 19 I&N Dec. at 445.

However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. See Matter of S-M-J-, 21 I&N Dec. at 725-26; see also Matter of M-D-, 21 I&N Dec. 1180 (BIA 1998).  If such evidence is unavailable, the applicant must explain its unavailability, and the Immigration Judge must ensure that the applicant's explanation is included in the record. See Matter of S-M-J-, 21 I&N Dec. at 725-26. The absence of such corroboration can lead to a finding that an applicant has failed to meet his or her burden of proof. Id. at 725. Also, when evidence shows the country at issue has a reputation for persecuting persons similarly situated to the asylum applicant, that evidence requires careful consideration of the applicant's claims. Id. at 726.

5.     *Persecution*

The meaning of "persecution," as developed through United States case law, contemplates harm or suffering inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor seeks to overcome. See Matter of Acosta, 19 I&N Dec. at 223. Persecution within the meaning of the Act does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional. See Matter of V-T-S-, 21 I&N Dec. 792 (BIA 1997). Persecution is not limited to physical harm, but may include mental suffering or even economic deprivation so severe as to constitute a threat to an individual's freedom or life. See Matter of Acosta, 19 I&N Dec. at 222. Prosecution for violating laws of general applicability does not constitute persecution unless the punishment is imposed for invidious reasons or is grossly disproportionate to the proscribed conduct. Id.

a.     *Past Persecution*

An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she suffered persecution in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself of the protection of, that country owing to such persecution. 8 C.F.R. § 1208.13(b)(1).  An applicant who is found to have

13

established such past persecution shall also be presumed to have a well-founded fear of future persecution on the basis of the original claim. 8 C.F.R. § 1208.13(b)(1).

The regulatory presumption may be rebutted if the DHS establishes by a preponderance of the evidence that either: (1) there has been a fundamental change in circumstances[2] so that the applicant no longer has a well-founded fear of persecution in that applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of one of the enumerated grounds; or (2) the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under the circumstances, it would be reasonable to expect the applicant to do so. 8 C.F.R. § 1208.13(b)(1)(i), (ii). If the applicant's fear of persecution is unrelated to the past persecution, the applicant bears that burden of establishing that the fear is well-founded. 8 C.F.R. § 1208.13(b)(1).

    *b.    Well-Founded Fear of Persecution*

An applicant has a well-founded fear of persecution if: (1) the applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he or she was to return to that country; and (3) he or she is unable or unwilling to return to, or avail himself of the protection of, that country because of such fear. 8 C.F.R. § 1208.13(b)(2)(i). In general, the applicant's fear should be considered well founded if the applicant can establish, to a reasonable degree, that his or her continued stay in that country has become intolerable for the applicant on the basis of one of the enumerated grounds, or would for the same reasons, be intolerable if he or she returned there. See Handbook on Procedures and Criteria for Determining Refugee Status, Office of the United Nations High Commissioner for Refugees, ¶42, p. 12-13. (Geneva, January 1992). An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all circumstances it would be reasonable to expect the applicant to do so. 8 C.F.R. § 1208.13(b)(2)(ii).

To establish a well-founded fear of persecution, an applicant must present credible testimony that demonstrates that his or her fear of harm is of a level that amounts to persecution, that the harm is on account of a protected characteristic, that the persecutor could become aware or is already aware of the characteristic, and that the persecutor has the means and inclination to persecute. See Matter of

---

    [2]By adopting the language "fundamental change in circumstances" rather than requiring a showing of "changed country conditions" to overcome the presumption, other changes in the circumstances surrounding the asylum claim, including a fundamental change in personal circumstances may be considered, so long as those changes are fundamental in nature and go to the basis of the fear of persecution.

PAGE 19/30 * RCVD AT 11/19/2007 10:13:27 AM [Eastern Standard Time] * SVR:DCNTFAX01/0 * DNIS:6285116 * CSID:301 345 2393 * DURATION (mm-ss):17-54

Mogharrabi, 19 I&N Dec. at 446; see also Matter of Acosta, 19 I&N Dec. at 226. A well-founded fear of persecution must be both subjectively genuine and objectively reasonable. See Cardoza-Fonseca, 480 U.S. at 430-31. To demonstrate a subjective fear of persecution, an applicant must demonstrate a genuine apprehension of awareness of the risk of persecution. See Matter of Acosta, 19 I&N Dec. at 221. The objective component requires a showing by credible, direct, and specific evidence in the record that the alien's fear of persecution is reasonable. See DeValle v. INS, 901 F.2d 787, 790 (9th Cir. 1990).

       c.    On Account of

An applicant for asylum must demonstrate that he or she is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of his or her country because of persecution or a well-founded fear or persecution "on account of" race, religion, nationality, membership in a particular social group, or political opinion. INA § 1208.13(b)(2)(i)(A). Even treatment that is regarded as "morally reprehensible" is not "persecution" withing the meaning of the Act unless it occurs "on account of" one of the five enumerated grounds in the Act. See Matter of T-M-B-, 21 I&N Dec. 775 (BIA 1997).

       6.    Discretion

Statutory and regulatory eligibility for asylum, whether based on past persecution or a well-founded fear of future persecution, does not necessarily compel a grant of asylum. See Cardoza-Fonseca, 480 U.S. at 441. As applicant for asylum has the burden of establishing that the favorable exercise of discretion is warranted. See Matter of Pula, 19 I&N Dec. at 471; see also Matter of Shirdel, 19 I&N Dec. 33 (BIA 1984). In exercising discretion, it is appropriate to examine the totality of the circumstances and actions of an alien in his or her flight from the country where persecution is feared. See Matter of Pula, 19 I&N Dec. at 473. Courts also consider whether the alien found safe haven after leaving the country where she claimed past or future persecution. See id.

General humanitarian reasons, independent of the circumstances that led to the applicant's refugee status, such as his or her age, health, or family ties, should also be considered in the exercise of discretion. Id. at 474. Although the totality of the circumstances and actions of an alien in his or her flight from that country where persecution was suffered to the United States are to be considered and may weight against a favorable exercise of discretion, "the danger of persecution should generally outweigh all but the most egregious of adverse factors." Id. at 474.

The Board has also held that even if there is little likelihood of future persecution, an applicant may establish eligibility or asylum if he or she shows that he or she has suffered such severe past persecution on account of one or more of the enumerated grounds that it would be inhumane to return him to his or her country. See Matter of Chen, 20 I&N Dec. 16 (BIA 1989).

15

C.     *Withholding of Removal Pursuant to INA § 241(b)(3)*

The burden of proof required to establish eligibility for asylum is lower than that required for withholding of removal, which requires the Respondent to show that it is "more likely than not" that he or she will be persecuted in Rwanda on account of a protected ground. 8 C.F.R. § 1208.16(b)(1); see INS v. Stevic, 467 U.S. 407 (1984); see also INS v. Cardoza-Fonseca, 480 U.S. at 463. Aliens convicted of a particularly serious crime are ineligible for withholding of removal. 8 C.F.R. § 1208.16(d)(2).

D.     *Withholding and Deferral of Removal Under the Convention Against Torture*

An applicant for withholding or deferral of removal under the Torture Convention bears the burden of proving that it is "more likely than not" that he or she would be tortured if removed to the proposed country of removal. 8 C.F.R. §§ 1208.17; 1208.16(c)(2). As for withholding of removal under INA § 241(b), aliens convicted of a particularly serious crime are ineligible for withholding of removal under the CAT. See 8 C.F.R. § 1208.16(d)(2).

Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. § 1208.18(a)(1). Torture is an "extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman, or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). Additionally, to constitute torture, the "act must be directed against a person in the offender's custody or physical control." 8 C.F.R. § 1208.16(a)(6). Further, the pain or suffering must be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "Acquiescence of a public official" requires that the public official, "prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); see also Matter of S-V-, 22 I&N Dec. 1306 (BIA 2002).

The evidentiary burden can be sustained by testimony without corroboration if the testimony is credible. 8 C.F.R. § 1208.16(c)(2); 8 C.F.R. § 1208.13(a); see also Matter of Y-B-, 21 I&N Dec. 1136 (BIA 1998). In assessing whether an applicant has satisfied the burden of proof, the Court must consider all evidence relevant to the possibility of future torture, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where she is not likely to be tortured; evidence of gross, flagrant, or mass violations of human rights within the country of removal; and other relevant information regarding conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3). The Attorney General has held that protection under CAT cannot be established by stringing together a series of suppositions to show that it is more likely than not that torture will result where the evidence does not establish that each step in the hypothetical chain of events is more likely than not to occur. Matter of J-F-F-, 23 I&N Dec. 912 (A.G. 2006).

Deferral of removal does not confer upon the Respondent any lawful or permanent immigration status in the United States. If Respondent is subject to custody of the DHS, deferral of removal will not result in

16

his release from custody. Deferral of removal may be terminated by the Court if the Court later determines it is not likely that Respondent would be tortured in the country to which removal has been deferred. See 8 C.F.R. § 1208.17. The DHS District Director in the district with jurisdiction over an alien whose removal has been deferred must file a motion fulfilling certain requirements with the Immigration Court to schedule a hearing to consider whether deferral of removal shall be terminated. See 8 C.F.R. § 1208.17(d). The alien also may terminate deferral of removal at his own request. See 8 C.F.R. § 1208.17(e)(1).

Termination of deferral of removal also can occur if the Attorney General (through the Secretary of State) has received diplomatic assurances from the government of a specific country that an alien would not be tortured there if the alien were removed to that country. The Attorney General must decide whether the assurances are sufficiently reliable to allow the alien's removal to the country consistent with Article 3 of the Convention Against Torture. See 8 C.F.R. § 1208.18(c). Deferral of removal is applicable only to the country in which it has been determined that the alien is likely to be tortured, and thus the alien may be removed at any time to another country where he is not likely to be tortured. See 8 C.F.R. § 1208.17(b)(2).

## IV. DISCUSSION

*A.     Applications for Asylum and Withholding of Removal under INA § 241(b)(3) and CAT*

The credibility and burden of proof provisions of the REAL ID Act of 2005 govern this case.

### 1.     One-Year Deadline

The Court finds that Respondent meets the one-year asylum application deadline. See INA § 208(a)(2)(B). Respondent was lawfully present in the United States until his parole was revoked, when the District of Columbia District Court dismissed his case on August 17, 2006. Respondent's entry date, for purposes of the one-year bar, thus began at this date. See INA § 212(d)(5) (noting that the parole of an alien shall not be regarded as an admission). He filed his asylum application with the DHS on January 4, 2007, less than five months after his parole was revoked. Therefore, the Court finds that Respondent filed his asylum application within the one-year deadline under INA § 208(a)(2)(B).

### 2.     Mandatory Bars to Asylum and Withholding of Removal

The Court finds that two mandatory bars to asylum and withholding of removal apply to Respondent. First, Respondent ordered, incited, assisted, or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. §§ 1208.13(c)(2)(i)(E), 1208.16(d)(2). Second, there are reasonable grounds for regarding Respondent as a danger to the security of the United States. 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2).

17

The Court also finds that a third mandatory bar to asylum, engagement in terrorist activity, or representing a terrorist organization or a political, social, or other group that endorses or espouses terrorist activity, applies to Respondent. 8 C.F.R. § 1208.13(c)(2)(ii)(F)

Notwithstanding the fact that these removal proceedings are civil proceedings and not governed by evidentiary requirements of federal criminal law, under the theory of *res judicata*, the Court recognizes the suppression by the District of Columbia District Court in United States v. Karake, supra, of statements Respondent made to Rwandan and American officials during the course of the investigation into the attack at Bwindi. The Court will adopt the District Court's finding that "the conditions under which defendants were held at Kami and the abuse and mistreatment they endured while being interrogated shock the conscience and therefore render their statements involuntary and inadmissible." Id. at 85-86.

If some appellate body should reverse this Court's reliance on the District Court's findings, and deem these statements admissible, the Court would find the evidence proves that Respondent both participated in the persecution of others on account of race or nationality and that there are reasonable grounds for regarding him a danger to the security of the United States. See 8 C.F.R. § 1208.13(c)(2)(i)(E); 8 C.F.R. § 1208.13(c)(2)(i)(C). Specifically, Respondent admitted in these statements that he participated in the Bwindi attacks, which resulted in the murder of eight tourists, that ALIR targeted "Anglophile" tourists of English or American nationality in this attack. See Karake, supra at 23-41. This act constitutes the persecution of others on account of race or nationality. See 8 C.F.R. §§ 1208.13(c)(2)(i)(E), 1208.16(d)(2). Respondent's active role as first sergeant in the Irondelle Company of ALIR, an organization that the State Department considers a terrorist group, also provides reasonable grounds for regarding Respondent as a danger to the security of the United States, and a person who engaged in terrorist activity, or represented a group that espouses such activity. See Group Exhibit 7, Tab 2; 8 C.F.R. §§§ 1208.13(c)(2)(i)(C), 1208.16(d)(2), 1208.13(c)(2)(ii)(F).

If, however, an appellate body upholds the Court's decision that the statements of the Respondent are inadmissible and suppresses the evidence, the Court still would find that these mandatory bars apply to Respondent for the following reasons:

> a.   *Respondent Bears the Burden of Proof to Demonstrate that the Mandatory Bars Do Not Apply*

In this case, Respondent, who seeks to apply for relief from removal, bears the burden of establishing that he satisfies the applicable eligibility requirements and merits a favorable exercise of discretion. INA § 240(c)(4)(A)(i)-(ii); 8 C.F.R. § 1240.8(d).

Further, the Government's evidence in this case indicates that grounds for mandatory denial of Respondent's application for relief may apply. Respondent testified that he had joined ALIR in 1998 and fought with ALIR against the RPF until 2001. Further, he stated that he was a section leader in the Irondelle company, and that he accompanied his section to the Bwindi park in Uganda once between

18

January and March 1999. He added that his platoon chief ordered him to create a roadblock to keep people from "coming back." Respondent also indicated that he saw "white people" speaking with the company head, and while returning through the bush, he saw soldiers with white people in one place. The record contains evidence that ALIR has been on the State Department's Terrorist Exclusion List since it was created in 2002. See Group Exhibit 7, Tab 2. Although the State Department Terrorist Exclusion List was not created until 2002 and the Respondent testified that he left ALIR in 2001, there is credible evidence in the record that ALIR committed terrorist acts while Respondent was a member. Specifically, the findings of fact in Karake relate that ALIR had kidnapped and murdered tourists in Bwindi on March 1, 1999 on the basis of their nationality. See Karake, supra, at 19-20.

Therefore, the Court finds that the DHS provides *prima facie* evidence that Respondent, as an ALIR member, may have ordered, incited, or otherwise participated in the persecution of others on account of race or nationality; and that there are reasonable grounds for regarding Respondent, who had fought with a militia that the U.S. Government considers a terrorist organization, as a danger to the security of the United States. See 8 C.F.R. § 1208.13(c)(2)(i)(E); 8 C.F.R. § 1208.13(c)(2)(i)(C); 8 C.F.R. § 1208.16(d)(2). This testimony and the findings in Karake also provide *prima facie* evidence that Respondent engaged in terrorist activity, or represented a terrorist organization or a political, social, or other group that endorses or espouses terrorist activity. 8 C.F.R. § 1208.13(c)(2)(ii)(F) The burden thus shifts to Respondent to establish, by a preponderance of the evidence, that such grounds are inapplicable. See 8 C.F.R. § 1208.13(c)(2)(ii); 8 C.F.R. § 1240.8(d); Matter of S-K-, 23 I&N Dec. 936, 939 (BIA 2006); Matter of R-S-H-, 23 I&N Dec. 629, 640 (BIA 2003).

    *b.   Respondent Is Unable to Establish that the Mandatory Bars Do Not Apply*

The Court finds that Respondent is unable to establish, by a preponderance of the evidence, that these mandatory bars to asylum and withholding of removal do not apply. See id. Respondent admitted in his testimony that he was a member of ALIR and participated in ALIR activities. He became a first sergeant in ALIR, with the responsibility of supervising other soldiers. Further, he was a section leader in the Irondelle company who accompanied his section to the Bwindi park in Uganda once between January and March 1999. His platoon chief ordered him to create a roadblock to keep people from "coming back." Finally, Respondent also indicated that he saw "white people" speaking with the company head, and "soldiers with white people" while he returning through the bush.

Respondent also testified that he did not know of or participate in the atrocities in Bwindi. However, Respondent's membership in the Irondelle Company of ALIR, and his testimony that he was at the Bwindi park with Irondelle soldiers and saw white people situates him in the midst of these atrocities. See id. The record, including Mr. Kiever's witness testimony, also indicate that ALIR kidnapped, attacked, murdered, and raped tourists, whom ALIR had identified as "Anglophiles" or persons associated with the English or Americans. See Karake, supra at 19-20; Group Exhibit 7, Tabs 4-13. Respondent provided no evidence to establish, by a preponderance of the evidence, that he did not participate in these atrocities, and thus

. 19 .

persecute others on account of race of nationality.   See 8 C.F.R. §§§ 1208.13(c)(2)(ii), 1208.13(c)(2)(i)(E), 1208.16(d)(2).

Moreover, Respondent failed to meet his burden to demonstrate that he would not constitute a danger to the security of the United States. See 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2). Respondent's admission that he was a member of ALIR suggests that he was a member of a terrorist organization, pursuant to the State Department's Terrorist Exclusion List. See Group Exhibit 7, Tab 2. The record also indicates that the U.S. government considers organizations on this list sources of violence and global insecurity. Id. Because Respondent merely protested, but did not provide evidence to rebut the DHS' claim that he is a member of a group that the U.S. Government deems a terrorist organization, the Court finds that there remain reasonable grounds for regarding him as a danger to the security of the United States. See 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2).   As such, he is ineligible for asylum, withholding of removal under INA § 241(b)(3), and withholding of removal under the Convention Against Torture. See INA §§§ 208(b)(2)(A)(i), (iv), 241(b)(3)(B); 8 C.F.R. § 1208.16(d)(2).

Respondent also provided no evidence, other than his testimony, to rebut the Government's documentation that ALIR is a terrorist organization, and its claim that as a member of ALIR's Irondelle company at Bwindi on March 1, 1999, Respondent engaged in terrorist activities. See 8 C.F.R. § 1208.13(c)(2)(ii)(F). The Court finds Respondent's testimony on this issue not credible. Respondent's assertion that he did not engage in the Bwindi attack directly conflicts with his testimony that he was a member of the Irondelle company, was in Bwindi on the date of the attack, created a roadblock to keep people from "coming back," and saw white people interacting with his soldiers within that time frame. The testimony also conflicts with evidence that Respondent's Irondelle company carried out the Bwindi attacks that day. See Karake, supra at 19-20; Group Exhibit 7, Tabs 4-13. Therefore, Respondent fails to meet his burden of proof to demonstrate that the terrorist bar to asylum does not apply in this case. See 8 C.F.R. § 1208.13(c)(2)(ii)(F).

   3.   Credibility

After viewing the totality of Respondent's record, the Court finds that Respondent is not a credible witness in regard to his role in ALIR and its attacks on civilians in 1999. The Court finds Respondent's claim of torture in 2002 by the RPA credible based on the District Court's decision. In assessing the credibility of his testimony, the Court has taken into account the plausibility and consistency of his account, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of his claim. See INA § 208(b)(1)(B)(iii).

An asylum applicant must establish the facts underlying his claim for relief by believable, consistent, and sufficiently detailed evidence that provides a plausible and coherent account of the basis of her fear. Testimony is not considered credible when it is inconsistent, contradictory with current country conditions, or inherently improbable. See Matter of S-M-J-, 21 I&N Dec. at 729. The Court finds that Respondent was not a credible witness in regard to several of his activities with ALIR.

20

Specifically, the Court finds Respondent's testimony relating to his role in ALIR atrocities not credible. Respondent asserted that when he fought with ALIR, he never harmed any civilians. He said that he saw "white people" with his soldiers at Bwindi, but was not aware of atrocities committed by ALIR against them. The Court finds this testimony inconsistent with other evidence on the record and implausible. See INA § 208(b)(1)(B)(iii). First, Respondent's claim that he did not know of atrocities committed by ALIR against civilians and foreigners at Bwindi on March 1, 1999 conflicts with evidence in the record demonstrating that his specific company in ALIR, Irondelle, carried out the Bwindi attacks on March 1, 1999. See Karake, supra at 19-20; Group Exhibit 7, Tabs 4-13.

Second, the Court finds Respondent's claim implausible because the information he admitted situations him at the scene of the massacre and indicates that he knew at least some details of the attack. Respondent testified that he was his ALIR section leader, in the Irondelle company, at Bwindi on March 1, 1999. He added that he saw four white people speaking with his company head and, later, with soldiers. He indicated that he did not know why they were "taken with his group" when his group left the site of the attack. Further, Respondent stated that he created a roadblock to keep people from "coming back" at Bwindi. This testimony places Respondent at Bwindi on the date of the massacre with the company of ALIR that murdered and raped the Bwindi victims. Respondent's acknowledgment that he saw his fellow soldiers interact with "white people," at the park, who were "taken with his group" also indicates that he knew that ALIR took the victims against their will. Finally, Respondent's creation of a roadblock to keep people from "coming back" supports the Government's claim that he actively played a role in preventing the escape of victims that day.

Based on these inconsistencies and implausibilities, the Court finds that Respondent could not explain or substantiate his claim that he did not participate in any atrocities as a soldier. The Court thus finds Respondent's testimony regarding his participation in attacks by ALIR not credible. See § 208(b)(1)(B)(iii); see also Matter of S-M-J-, supra. Therefore, Respondent must submit corroboration to bolster his claim of benign ALIR activities. See id. at 720. Respondent submitted no corroborating evidence to support his claim that he did not participate in any atrocities against civilians or RPF members while he was in ALIR.

The Court, however, finds other aspects of Respondent's testimony credible based on the District Court's findings. The evidence in the record independently supports Respondent's account of "torture" and other abuse by the RPA following his arrest in 2002. See Camara, supra; Matter of S-M-J-, supra. First, the Court accepts the 2006 findings by the District of Columbia District Court that Respondent endured "countless hours of repetitive questioning over a period of many months" when he was "subjected to periods of solitary confinement, positional torture, and repeated physical abuse" that "shock the conscience." See Karake, supra at 94. Specifically, his physician found that his body showed signs of "patterned scars" on his extremities consistent with his reports of tight, shackled binding. Id. at 65. The physician also noted "irregular scarring," reflecting Respondent's explanation that his ankle had become infected after being cut by the shackle. Id. Further, he observed "multiple separate incisions" that "could

21

not be 'the result of random impact or a single cut,' that 'are highly consistent with [the] specific torture scenarios that he described.'" Id.

Other evidence in the record further corroborates this finding. The 2006 State Department Country Report for Rwanda indicates "deplorable conditions" in government-run detention centers, where detainees are subject to beatings, inadequate food, water and medical care. See Group Exhibit 7, Tab 15. Amnesty International further reports extrajudicial executions and "harsh" and "cruel" treatment in military detention centers. See Group Exhibit 9.

After considering the totality of his documentary record, the Court therefore finds that Respondent failed to provide a plausible and coherent account of his activities in ALIR. See Matter of Dass, 20 I&N Dec. 120, 124 (BIA 1989); see also 8 C.F.R. § 1208.13(a). Respondent's implausible claim that was unaware of atrocities committed by his Irondelle company, coupled with inconsistencies between the testimony he did submit and the record, provide a specific and cogent reason to support an adverse credibility finding. See Matter of A-S-, 21 I&N Dec. 1106 (BIA 1998). However, the Court finds that Respondent's account of his torture by the RPA in 2002 credible. See INA § 208(b)(1)(B)(iii).

The Court finds the Government's witness, Mr. Kiever, fully credible. As an eyewitness to the events at Bwindi on March 1, 1999, Mr. Kiever provided a detailed, specific, and coherent account of his experience as a hostage. See INS v. Elias-Zacarias, 502 U.S. 478 (1992) (requiring specific and detailed evidence to support a claim). Moreover, the details he provided directly correlate to the factual findings in Karake, supra at 19-20, that ALIR targeted English-speaking foreigners and killed several men and women whom they captured. Other evidence in the record further corroborates the details in Mr. Kiever's testimony, such as the photographs and maps from Bwindi and other witness accounts of the massacre. See Group Exhibit 7, Tabs 4-13.

### 3.    Article 3 of the Torture Convention

Deferral of removal under the Convention Against Torture may be available to an alien otherwise precluded from asylum or withholding of removal by a mandatory bar. See 8 C.F.R. §§ 1208.16(d)(2), 1208.17(a). The Court has found that two mandatory bars to withholding apply to Respondent—that he participated in the persecution of others on account of race or nationality and that there are reasonable grounds for regarding him a danger to the security of the United States. See 8 C.F.R. §§ 1208.13(c)(2)(i)(E), § 1208.13(c)(2)(i)(C). As such, he is ineligible for withholding of removal under CAT, and the only available relief is deferral of removal. 8 C.F.R. § 1208.16(d)(2).

Respondent qualifies for deferral of removal under the Torture Convention. First, Respondent has established a credible fear of torture in Rwanda. The Court adopts the District of Columbia District Court's finding in Karake that Respondent suffered torture at Kami camp. Specifically, he endured "countless hours of repetitive questioning over a period of many months," when he was "subjected to periods of solitary confinement, positional torture, and repeated physical abuse," and that the abuse and

22

mistreatment he experienced at Kami "shock the conscience." See Karake, supra at 85-86, 94. The District Court's findings indicate trauma to Respondent's arms, legs, and extremities that "could not be 'the result of random impact or a single cut,' and 'are highly consistent with [the] specific torture scenarios that he described.'" Id. at 65.

The record also indicates that Respondent more likely than not, as a returning ex-ALIR prisoner under the RPF regime, will continue to endure similar treatment in Rwanda. The 2006 State Department Country Report for Rwanda indicates "deplorable conditions" in government-run detention centers, where detainees are subject to beatings, inadequate food, water and medical care. See Group Exhibit 7, Tab 15. Amnesty International further reports extrajudicial executions and "harsh" and "cruel" treatment in military detention centers. See Group Exhibit 9. The Court thus finds that Respondent, a prisoner considered an enemy of the current regime, faces a significant threat of physical force, beatings, and other serious abuse if he returns to Rwanda.

Second, Respondent demonstrates that this treatment he fears in Rwanda constitutes torture. Torture is defined as an "extreme form of cruel and inhuman treatment...by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. §§ 1208.18(a)(1), (2). The District of Columbia District Court had found that the treatment Respondent and his co-defendants in Karake experienced in Rwanda constitutes torture. See Karake, supra at 85-86, 94. The District Court also noted witness and U.S. government agency reports of abuse, torture, and other inhumane conditions at the Kami detention center. Id. at 69. Forced confessions, through torture, were common, and reports of disappearances and extrajudicial killings persist. Id. at 69-73.

Third, Respondent has established that public officials in Rwanda would acquiesce in Respondent's torture. See Matter of S-V-, 22 I&N Dec. 1306 (BIA 2000). Kami Camp, along with other RPA-affiliated detention centers, are government-run facilities. See Karake, supra at 15. Moreover, the District Court notes that Respondent recently was under the supervision of Rwanda's Department of Military Intelligence ("DMI") at Kami Camp. See id. at 22 n.9. This information thus strongly suggests that Rwandan authorities, some of whom tortured Respondent while interrogating him, are aware of the use of torture in government-run facilities and breach their legal responsibility to intervene. 8 C.F.R. § 1208.18(a)(7); see also Matter of S-V-, supra.

Fourth, this case does not present a J-F-F- situation in which the applicant or the Immigration Judge postulate an unlikely string of suppositions in a futile attempt to create a probability out of a series of improbabilities. See Matter of J-F-F-, supra. This Respondent has provided corroborating documentation establishing that representatives of the current Rwandan government have a history of using torture against former ALIR members in prison, and that torture by the same authorities upon his return to Rwanda is probable, particularly since Respondent exposed the use of torture and other abuse by government officials at their military camps.

23

Moreover, in commenting on this case, the State Department provided no assurances that Respondent is not likely to be tortured in Rwanda. See 8 C.F.R. § 1208.18(f). Rather, it noted that the authorities would prosecute Respondent after he returns to Rwanda, and that Rwandan authorities have made "positive efforts" to improve prison and detention center conditions. See Exhibit 8. The letter vaguely indicated that reports of such treatment "have decreased," but also suggests that abuse and torture in Rwandan prisons still exist. See id. In the context of other evidence in the record that notes torture is common in government-run prisons, these efforts thus do not appear to alleviate the danger Respondent faces upon his return to Rwanda.

Therefore, the Court finds that Respondent has borne his burden to establish eligibility for deferral of removal under the Convention Against Torture by a preponderance of the evidence, and will grant his application for such relief.

Accordingly, after a careful review of the entire record, and for the reasons stated above, the Court enters the following Order:

24

## ORDER

| | |
|---|---|
| <u>It Is Ordered that:</u> | Respondent's application for asylum, pursuant to INA § 208(a), be **DENIED.** |
| <u>It Is Further Ordered that:</u> | Respondent be **REMOVED** to Rwanda pursuant to the charge in his Notice to Appear. |
| <u>It Is Further Ordered that:</u> | Respondent's application for withholding of removal to Rwanda, pursuant to INA § 241(b)(3), be **DENIED.** |
| <u>It Is Further Ordered that:</u> | Respondent's application for withholding of removal to Rwanda, pursuant to the Convention Against Torture, be **DENIED.** |
| <u>It Is Further Ordered that:</u> | Respondent's application for deferral of removal under Article 3 of the Convention Against Torture be **GRANTED.** |
| <u>It Is Further Ordered that:</u> | In accordance with 8 C.F.R. § 1208.17(b), the respondent is hereby notified that deferral of removal: (1) does not confer any lawful permanent immigration status in the United States; (2) will not necessarily result in the respondent's release from DHS custody if the respondent is subject to DHS custody; (3) is effective only until terminated; (4) is subject to review and termination if an Immigration Judge determines that it is not likely that the respondent would be tortured in the country to which removal has been deferred or if the respondent requests that deferral be terminated; (5) applies only to the country in which it has been determined that the respondent is likely to be tortured and that the respondent may be removed at any time to another country where he is not likely to be tortured. |

9-27-07
_____
Date

Wayne R. Iskra
United States Immigration Judge

25