# EXHIBIT C

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
901 NORTH STUART ST., STE.1300
ARLINGTON, VA  22203


O'TOOLE, ESQ., JEFFREY B.
1350 CONNECTI.AVE. N,W,STE 200
WASHINGTON, DC  20036


IN THE MATTER OF            FILE A 79-187-646      DATE: Sep 5, 2007
BIMENYIMANA, LEONIDAS

___ UNABLE TO FORWARD - NO ADDRESS PROVIDED

_X_ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE.  THIS DECISION
IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
MUST BE MAILED TO:      BOARD OF IMMIGRATION APPEALS
                        OFFICE OF THE CLERK
                        P.O. BOX 8530
                        FALLS CHURCH, VA  22041


___ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS.  IF YOU FILE A MOTION
TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                        IMMIGRATION COURT
                        901 NORTH STUART ST., STE.1300
                        ARLINGTON, VA  22203


___ OTHER: _____

        _____

                        _Phyllis C. Eddy_
                        COURT CLERK
                        IMMIGRATION COURT                        FF

    CC:

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### United States Immigration Court
### 901 North Stuart Street, Suite 1300
### Arlington, Virginia 22203

|  |  |  |
|---|---|---|
| **IN THE MATTER OF:** | ) | **IN REMOVAL PROCEEDINGS** |
|  | ) |  |
|  | ) |  |
| BIMENYIMANA, Leonidas | ) | **File No. :**    A# 79-187-646 |
|  | ) |  |
| Respondent | ) |  |
|  | ) |  |

**CHARGE:**     Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA" or "Act"), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, other suitable travel document, or document of identity and nationality as required under INA § 211(a).

**APPLICATIONS:**   Asylum, pursuant to INA § 208(a);
Withholding of Removal, pursuant to INA § 241(b)(3);
Withholding of Removal, under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), pursuant to 8 C.F.R. § 1208.16 (2007); and
Deferral of Removal, under the CAT, pursuant to 8 C.F.R. § 1208.17.

## APPEARANCES

**ON BEHALF OF RESPONDENT:**
Jeffrey B. O'Toole, Esq.
Danya A. Dayson, Esq.
O'Toole, Rothwell, Nassau & Steinbach
1350 Connecticut Avenue, NW, Suite 200
Washington, DC 20036

**ON BEHALF OF THE DHS:**
Jo Ellen Ardinger, Esq.
Daniel I. Smulow, Esq.
Associate Legal Advisors
Department of Homeland Security
901 North Stuart Street, Suite 1307
Arlington, Virginia 22203

## DECISION AND ORDER

### I. PROCEDURAL HISTORY

Respondent is a 39-year-old male, and a native and citizen of Rwanda, who was paroled into the United States on March 2, 2003 at San Juan, Puerto Rico. The Department of Homeland Security alleges that his parole has expired or been revoked, and that Respondent does not possess a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document.

The Department of Homeland Security ("DHS") commenced removal proceedings against Respondent on February 23, 2007 by filing a Notice to Appear ("NTA") with the Court. The DHS charges Respondent as inadmissible pursuant to INA § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA" or "Act"), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, other suitable travel document, or document of identity and nationality as required under INA § 211(a).

At a hearing on May 24, 2006, Respondent, through counsel, conceded proper service of the NTA, admitted factual allegations (1) and (2), denied allegations (3) through (5), and denied the charge under INA § 212(a)(7)(A)(i)(I).

The Court upholds factual allegations (3) through (5). The record indicates that Respondent was paroled into the United States on March 2, 2003 to testify in United States v. Karake, 443 F.Supp.2d 8 (D.D.C. 2006). Respondent's parole expired at the end of the case in August 2006. At that time, Respondent was not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the INA. See INA § 212(a)(7)(A)(i)(I). This Court therefore finds Respondent's charge of removability to be sustained by clear and convincing evidence. See 8 C.F.R. § 1240.8(a).

On August 17, 2006, following an indictment charging Respondent and two other defendants with killing American tourists in the Bwindi Impenetrable National Forest ("Bwindi") on March 1, 1999, the United States District Court for the District of Columbia granted Respondent's joint motion to suppress statements made to Rwandan and United States officials, finding that the statements resulted from physical and psychological coercion and torture. See Karake, supra at 94.

As relief from removal, Respondent seeks to renew his application for asylum, initially filed on December 29, 2006. In the alternative, he seeks withholding of removal to Rwanda under INA § 241(b)(3), withholding of removal to Rwanda under the CAT pursuant to 8 C.F.R. § 1208.16, and deferral of removal to Rwanda under 8 C.F.R. § 1208.17.

For the reasons discussed below, the Court will deny Respondent's application for asylum, withholding of removal under INA § 241(b)(3), and withholding of removal under the CAT. The Court will grant Respondent's request for deferral of removal under the CAT.

## II. TESTIMONY AND EVIDENCE

*A.    Respondent's Asylum Application and Supporting Statements*

Respondent filed his initial asylum application with the DHS on December 29, 2006, and an amended application with Arlington Immigration Court on April 17, 2007. See Exhibit 2. In his application and accompanying statements, Respondent relates that he was born on April 18, 1968 in Ruhengeri, Rwanda and is a Rwandan citizen. He writes that he is an ethnic Hutu. He initially served in the Armed Forces of Rwanda ("FAR"), became a Sergeant in 1988, and fought in the civil war until 1992. He indicates that he did not participate in the genocide. Respondent adds that he began attending the National Police Academy in 1992 and became a Judiciary Police Officer in 1994. In that position, he investigated traffic accidents, vandalism, rape, theft, and murder charges. In 1994, he became a refugee, and then joined the Army for the Liberation of Rwanda ("ALIR"), for which he served as a Second Lieutenant.

Respondent relates that in 1996, he lived in the Sake refugee camp in Congo with his family. In October 1996, the Rwandan Patriotic Army ("RPA") attacked the camp with mortar and small guns. Respondent and his family escaped to the Mugunga Camp in the Congo, which also was attacked. In October, the family returned to the Sake camp, until the RPA destroyed it in November 1996. Respondent adds that in 1997, the RPA killed two of his brothers, his grandfather, and his cousin. He believes that the RPA had sought him out as a former FAR member, and killed his family members to punish him.

The RPA arrested Respondent in 2002 for being a member of the Army for the Liberation of Rwanda ("ALIR"), a military group opposed to the current regime. Respondent states that he did not participate in any atrocities while fighting with ALIR. The RPA briefly detained him in the Congo, and then moved to Rwanda. In July 2002, the RPA moved him to a Department of Military Intelligence ("DMI") prison. He writes that the RPA tortured him by kicking him, slapping his ears, hitting him on the chest and back with a sock containing a brick, and striking him on the soles of his feet. The RPA also subjected him to long periods of solitary confinement, shackled his wrist to the opposite ankle, bound him above the elbows for long periods of time, deprived him of food and clothing, confined him in a cell with no mattress or chair, and forced him to stand or sit in water thrown in his cell. Further, the RPA repeatedly threatened to kill him. Respondent adds that when the RPA detained him, the officers interrogated him about his involvement in ALIR and about an attack ALIR had carried out in 1999 in Uganda.

Respondent believes he will be tortured or killed by the RPA, the DMI, or other branches of the military or police if he returns to Rwanda. He relates that his testimony against the RPA and DMI at a hearing in the U.S. District Court exposed information that makes him vulnerable to retribution. He believes that if he returns to the Congo or Uganda, individuals in those countries will hand him over to the Rwandan

authorities.

### B.    Respondent's Testimony

Respondent stated that he joined the Rwandan national gendarmerie voluntarily as a soldier in 1988. He noted that he received combat training from 1988 through 1990 during that period at an officer training institution called Esso. He related that he had not engaged in combat before 1990. In 1990, the armed forces appointed Respondent as a section leader between 1990 and 1992. His section engaged in combat from 1990 through 1991. Respondent recalled that he carried a firearm at the time while he fought the Rwandan KGI army. He said that he did not take any civilians into custody during that time. From 1991 though 1992 Respondent's section worked as peacekeepers in Kigali. He indicated that his section did not capture any Rwandan army members or civilians.

Respondent noted that he attended a police training school, called Egena, from 1992 through 1993, and graduated in 1993 as a police officer with a specialty in criminal law enforcement. He remained in this position until 1994. Respondent testified that he never arrested anyone for supporting the Rwandan Patriotic Front ("RPF") at this time. He further indicated that he was responsible for interrogating civilians between 1993 and 1994. He said that neither he nor any member of his unit ever harmed anyone physically during interrogation

Respondent stated that he abandoned the police force and fled to Goma, Congo in July 1994 because he feared that the RPF would capture and kill him for being a Hutu. He related that he stayed with his family from 1994 through 1996 and did not engage in any military activities. He added that in 1997 some members of his family were murdered, and he believes that the RPF was responsible.

According to Respondent, he joined the Liberation Army of Rwanda ("ALIR") in 1997. He remained with the militia and fought the RPF in Congo until his ALIR unit disbanded in October 2001. During his years in ALIR, he carried a rifle. After he left the militia, he left his rifle with a colleague. Respondent noted that after 2001, he worked as a farmer in Congo. On June 16, 2002, the RPF arrested him.

Respondent testified that he fears returning to Rwanda. He believes that the military will arrest him and his family because he is a Hutu who had been a member of ALIR. He also fears retribution for statements he made about Rwanda during his U.S. District Court hearing in 2006.

### C.    Factual Findings in United States v. Karake

The Court recognizes the following factual findings in United States v. Karake, 443 F.Supp. 2d.8 12, 19 (D.D.C. 2006).

4

The United States District Court for the District of Columbia notes that Respondent, along with Defendants Francois Karake and Gregoire Nyaminani, faced a four-count indictment relating to the March 1, 1999 killings of two American tourists in Bwindi Impenetrable National Forest ("Bwindi") in southwestern Uganda. Id at 12. ALIR carried out the attack, which also resulted in the deaths of several other tourists and one Ugandan national park guard. Id.

For much of the second half of the twentieth century, Rwanda was divided largely among ethnic lines between the Hutu, Tutsi, and Twa. Id. at 14. The Hutu majority assumed power in a series of elections in 1960-61 known as the "Hutu Revolution." Id. A group of Tutsi refugees, who had fled or been displaced from Rwanda, created the Rwandan Patriotic Front ("RPF"), which advocated the overthrow of Rwanda's Hutu regime. Id. The military wing of the RPF, known as the Rwandan Patriotic Army ("RPA"), invaded Rwanda in 1990. Id. From 1990 to 1994, divisions continued to grow within Rwanda between hard-line proponents of Hutu solidarity, on the one hand, and the Tutsi minority and moderate Hutus, on the other. Id.

On April 6, 1994, a plane carrying Rwandan President Juvenal Habyarimana was shot down outside Kigali. Responsibility for the assassination was never confirmed. Id. The death sparked a slaughter of the minority Tutsi population and Hutus who were considered sympathetic to the Tutsi. Id. Death estimates range from 800,000 to more than a million, and ended only with the RPA's defeat of the Hutu government in July 1994. Id.

In 1994, the FAR fled to the Democratic Republic of Congo ("DROC"), and became the ex-FAR. Id. at 15. The ex-FAR, with genocidal civilian gangs called the Interahamwe and other Hutu refugees, formed the ALIR. Id. The ALIR made repeated guerrilla-style incursions into Rwanda until at least 2001. Id.

The District Court also found that ALIR forces attacked Bwindi on March 1, 1999. Id. at 19. The ALIR unit responsible for the attack that day was Irondelle Company. Id. On the morning of the attack, several groups of tourists, and approximately five Ugandan park rangers, were staying at various campsites within the park. Id. Seventeen tourists were taken hostage, including four Americans, six British, three New Zealanders, and one citizen each from Australia, Canada, Switzerland, and Uganda. Nine tourists survived, and eight were murdered. Id. at 20. Notes found with two murdered tourists, and testimony by surviving witnesses, indicates that ALIR targeted individuals whom they deemed "Anglophiles" or associated with the English or Americans. Id. at 19-20.

The Defendants moved to suppress the statements they made to Rwandan and American officials during the investigation into the Bwindi attack, while Respondent was housed at a military "barracks" known as Kami, outside of Kigali, Rwanda. Id. at 12. Kami also served as a detention center for Rwandan soldiers who were subject to disciplinary action. The District Court found that all three defendants in the case, including Respondent, suffered torture at Kami Camp. Specifically, their statements were "extracted only after countless hours of repetitive questioning over a period of many months," when they were "subjected to periods of solitary confinement, positional torture, and repeated physical abuse." Id. at 94. Based on the

5

totality of the circumstances, the District Court found that "the conditions under which defendants were held at Kami and the abuse and mistreatment they endured while being interrogated shock the conscience and therefore render their statements involuntary and inadmissible." Id. at 85-86.

Specifically, Respondent's physician, Dr. Stein, found that his body showed signs of "repeated trauma, both acute abrasions and tearing of his skin and repeated pressure" to part of his arms, legs, and hips. Id. at 65-66. The doctor concluded that Respondent's numerous scars were "highly indicative of *prolonged extremely tight binding* of his arms and...legs," as well as other "injuries which tore the skin." that were consistent with Respondent's reports of having to drag himself along the ground while bound, and being bound in an extremely tight manner over a period of days to weeks. Id. (emphasis in original). The doctor identified rope-like scars on his wrist, and other marks "highly consistent" with tight binding. Id. The District Court also noted non-physical evidence of torture at Kami camp, such as witness and U.S. government agency reports of abuse, torture, and other inhumane conditions at the camp. Id. at 69. Forced confessions, through torture, were common. Id. at 69-73. Based on this evidence, the District Court concluded that Respondent had been tortured and had not waived his rights before allegedly confessing his role in events at Bwindi. Id. at 94.

D.    *Suppressed Statements by Respondent During His Interrogation at Kami Camp*

The U.S. District Court for the District of Columbia granted Respondent's motion to suppress statements he made to Rwandan and American officials during the course of the investigation into the attack at Bwindi. This Court has not considered these statements in rendering its decision, unless otherwise indicated.

The suppressed statements indicated that Respondent joined the FAR in 1988, and spent one year studying at the FAR's military academy, called ESO. Id. at 18. He attained the rank of sergeant, and during the 1990 war, commanded a section of 11 or 12 soldiers. Id. After the war, he was promoted to "first sergeant." Id. He then attended a military school called Egena, where he trained to become a judicial police officer. Id. After graduating in 1992, he returned to the Ruhengeri Province, where he assisted in crime scene investigations and presented evidence in court in criminal cases. Id. After President Habyarimana's plane was shot down, he fought with the FAR until the RPF's victory, when he fled Rwanda. Id.

By 1997, Respondent returned to his family home in Ruhengeri. Id. The RPA began to harass his family, and eventually killed 11 family members, including his younger brother, his cousin, and his grandfather. Id. In 1997, Respondent joined ALIR, and became first sergeant. Id. at 19. He was assigned to lead the third platoon of Irondelle Company. Id. In the second half of 1999, have being promoted, Respondent left Irondelle Company to study for six months at an ALIR military academy called ESM in Maces, DROC. Id. He was promoted to second lieutenant in 2001, and remained an ALIR member until his capture by the RPA in June 2002. Id.

After his arrest, other Bwindi suspects referred to Respondent by his nickname, "Zappy Gadi." Id. at 44. He indicated that "we really attacked" Bwindi and that he personally "did not agree" with the decision to

6

kill the tourists. Id. He admitted to being physically present for "the killing of a man and woman together." Id. at 46-47. He described the Bwindi operation in detail, stating that his platoon gathered the tourists and sent them to his leader, and then ordered the burning of vehicles. Id. at 45. He saw a group of soldiers go "into the forest with the women tourists," and later learned that the men had raped and murdered the women. Id. at 45-46.

D.    *Documentary Evidence*

In support of his application, Respondent submitted the following documentary evidence: Respondent's amended I-589 and supporting statements, submitted to the Arlington Immigration Court on April 17, 2007 (Exhibit 2); his motion to terminate proceedings, which the Court denied on March 13, 2007 (Exhibit 3); his motion to preclude the DHS from re-litigating the issue of past persecution as a matter of collateral estoppel, which the Court denied on June 26, 2007 (Exhibit 6); and Respondent's supplemental exhibits, containing Tabs A-H (Group Exhibit 8). Group Exhibit 8 includes a copy of United States v. Karake et al., supra (Tab A); a CV and evaluation by Dr. David H. Stein (Tab B); reports by Dr. Jerry D. Spencer (Tab C); the 2005 and 2006 U.S. Department of State Country Reports for Rwanda (Tab D); Amnesty International Reports on Rwanda (Tab E); a report by Filip Reyntijens on Rwandan history (Tab F); a Front Line Rwanda report (Tab G); and the testimony of Respondent in Karake, supra (Tab H). The record also includes Respondent's Reply to the Department of Homeland Security's Closing Argument (Exhibit 11).

The Court overruled the Government's objections to the admission of Group Exhibit 8, Tab C(3), containing the testimony of Dr. Spencer in Karake, supra, and Tab F, containing Filip Reyntijens' report. The Court sustained the Government's objection to the portions of Tab H containing Mr. Karake's testimony, and pages 408-17, with testimony from Dr. Sandra Crosby.

In opposition to Respondent's application, the DHS submitted Respondent's Notice to Appear (Exhibit 1); a (Exhibit 7) and Government's evidence in response to Respondent's motion to terminate, including Tabs A-C (Exhibit 4). Exhibit 4 includes a memorandum detailing Respondent's parole authorization period (Tab A); the U.S. Department of State Terrorist Exclusion List (Tab B); and Respondent's record of inadmissible alien (Tab C). The DHS also submitted a motion to pretermit Respondent's applications for relief from removal, which the Court denied on June 26, 2007 (Exhibit 5); a reply to Respondent's motion to preclude the DHS from re-litigating the issue of past persecution as a matter of collateral estoppel (Exhibit 7); the Government's supplementary exhibits, containing tabs 1-24 (Exhibit 9); and open-source background information (Exhibit 10).

The Court sustains Respondent's objection to Group Exhibit 9, Tab 8, which contains a CD rather than a typed transcript. The Court overrules Respondent's objection to Group Exhibit 9, Tab 7, containing a compilation of letters by families of Bwindi massacre victims.

## III.  LEGAL ANALYSIS

### A.    Burdens of Proof

Generally, an individual who seeks to apply for relief from removal must establish that he or she satisfies the applicable eligibility requirements and merits a favorable exercise of discretion. INA § 240(c)(4)(A)(i)-(ii); 8 C.F.R. § 1240.8(d).

However, if the Government's evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the burden of proof shifts to the individual seeking the relief to establish, by a preponderance of the evidence, that such grounds are inapplicable. See 8 C.F.R. § 1240.8(d); Matter of S-K-, 23 I&N Dec. 936, 939 (BIA 2006); Matter of R-S-H-, 23 I&N Dec. 629, 640 (BIA 2003).

Asylum relief is mandatorily precluded to an individual who ordered, incited, assisted, or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 1208.13(c)(2)(i)(E). The mandatory bar also applies if there are reasonable grounds for regarding the alien as a danger to the security of the United States. 8 C.F.R. § 1208.13(c)(2)(i)(C). The applicant bears the burden of proving by a preponderance of the evidence that he did not commit either act if evidence indicated he did.  8 C.F.R. § 1208(c)(2)(ii).

### B.    Asylum

#### 1.    One-Year Filing Deadline

The Act specifies that the asylum applicant must demonstrate by clear and convincing evidence that he or she filed his or her application for asylum within one year of his or her arrival to the United States. INA § 208(a)(2)(B). If the application is filed after the one-year deadline, the burden of proof is on the applicant to establish to the satisfaction of the Immigration Judge that the circumstances were both beyond his or her control, and that but for those circumstances he or she would have filed within the one-year period. 8 C.F.R. § 1208.4.

#### 2.    Applicable Standards

An alien requesting asylum bears the evidentiary burden of proof and persuasion in connection with any application under Section 208 of the Act. See INS v. Cardoza-Fonseca, 480 U.S. 421, 435 (1987); Matter of Mogharrabi, 19 I&N Dec. 439, 446 (BIA 1987); 8 C.F.R. § 1208.13(a); see also Matter of S-M-J-, 21 I&N Dec. 722 (BIA 1997); Matter of Acosta, 19 I&N Dec. 211, 215 (BIA 1985), modified on other grounds.

To qualify for a grant of asylum, an alien must credibly demonstrate that he or she is a "refugee" within the meaning of section 101(a)(42)(A) of the Act. INA § 208(b)(1); see also INA § 101(a)(42)(A); 8 C.F.R.

§ 1208.13(a). As such, the alien must demonstrate that the alleged persecution or well-founded fear of future persecution is "on account of his race, religion, nationality, membership in a particular social group, or political opinion." INA § 101(a)(42)(A). Additionally, the alien must establish that he or she is unable or unwilling to avail himself of the protection of the alien's country of nationality or last habitual residence. Id. His or her fear of persecution must be country-wide. See Matter of C-A-L-, 21 I&N Dec. 754 (BIA 1997); Matter of R-, 20 I&N Dec. 621 (BIA 1992); Matter of Acosta, 19 I&N Dec. 211, 235; see also Matter of Fuentes, 19 I&N Dec. 658 (BIA 1988). Finally, the alien must demonstrate that he or she is eligible for asylum as a matter of discretion. INA § 208(b)(1); see also Cardoza-Fonseca, 480 U.S. at 441.

### 3.   Credibility

In all applications for asylum, the Court must make a threshold determination of the alien's credibility. See Matter of O-D-, 21 I&N Dec. 1079 (BIA 1998); see also Matter of Pula, 19 I&N Dec. 467 (BIA 1987). An applicant's own testimony is sufficient to meet his or her burden of proving his or her asylum claim if it is believable, consistent, and sufficiently detailed to provide a plausible and coherent account of the basis of his or her fear. See Matter of Dass, 20 I&N Dec. 120, 124 (BIA 1989); see also 8 C.F.R. § 1208.13(a). However, testimony is not considered credible when it is inconsistent, contradictory with current country conditions, or inherently improbable. See Matter of S-M-J-, 21 I&N Dec. at 730. While omissions of facts in an asylum application or during testimony alone might not, in themselves, support an adverse credibility determination, the omission of key events coupled with numerous inconsistencies may provide a specific and cogent reason to support an adverse credibility finding. See Matter of A-S-, 21 I&N Dec. 1106 (BIA 1998).

The REAL ID Act of 2005[1] amended sections of the Immigration and Nationality Act relating to the adjudication of asylum applications. Pub. L. No. 109-13, Div. B, 119 Stat. 231 (2005). In making credibility determinations, courts consider the totality of the circumstances and all relevant factors. Courts may base a credibility determination on the Respondent's or witness's demeanor, candor, or responsiveness, and the inherent plausibility of the account. Other relevant factors include the consistency between written and oral statements (whenever made, whether or not under oath, and considering the circumstances under which such statements were made), the internal consistency of each statement with other evidence of record (including Department of State country reports), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the Respondent's claim. Courts also may consider any other factors relevant to credibility. INA § 208(b)(1)(B)(iii).

Further, even in cases when the Respondent does not testify credibly, an evaluation of the record as a whole is necessary to determine whether independent evidence establishes the Respondent's claim. See Camara v. Ashcroft, 378 F.3d 361 (4th Cir. 2004). An adverse credibility finding does not necessarily preclude a

---

[1] Congress enacted the REAL ID Act on May 11, 2005. The changes it made to immigration law apply to asylum applications filed on or after that date.

grant of asylum when an applicant presents independent evidence that substantiates that the applicant suffered past persecution, especially when there is no evidence to the contrary and the story is plausible. See id., at 370. However, the Fourth Circuit has clarified that affidavits from friends and family are not the independent evidence that Camara contemplates. Gandziami-Mickhou v. Gonzales, 445 F.3d 351 (4th Cir. 2006).

### 4.    Corroboration

In determining whether an asylum applicant has met his or her burden of proof, the Board of Immigration Appeals ("BIA" or "Board") has recognized the difficulties that an alien may face in obtaining documentary or other evidence to support the alien's claim of persecution. See Matter of Dass, 20 I&N Dec. at 124-25. As such, unreasonable demands are not placed on an asylum applicant to present evidence to corroborate particular experiences (e.g., corroboration from the persecutor). See Matter of S-M-J-, 21 I&N Dec. at 725-26. In fact, lack of corroborative evidence is not necessarily fatal to an asylum application, as uncorroborated testimony that is credible, persuasive, and specific may be sufficient to sustain the burden of proof to establish a claim for asylum. 8 C.F.R. § 1208.13(a); see also Matter of Mogharrabi, 19 I&N Dec. at 445.

However, where it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided. See Matter of S-M-J-, 21 I&N Dec. at 725-26; see also Matter of M-D-, 21 I&N Dec. 1180 (BIA 1998). If such evidence is unavailable, the applicant must explain its unavailability, and the Immigration Judge must ensure that the applicant's explanation is included in the record. See Matter of S-M-J-, 21 I&N Dec. at 725-26. The absence of such corroboration can lead to a finding that an applicant has failed to meet his or her burden of proof. Id. at 725. Also, when evidence shows the country at issue has a reputation for persecuting persons similarly situated to the asylum applicant, that evidence requires careful consideration of the applicant's claims. Id. at 726.

### 5.    Persecution

The meaning of "persecution," as developed through United States case law, contemplates harm or suffering inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor seeks to overcome. See Matter of Acosta, 19 I&N Dec. at 223. Persecution within the meaning of the Act does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional. See Matter of V-T-S-, 21 I&N Dec. 792 (BIA 1997). Persecution is not limited to physical harm, but may include mental suffering or even economic deprivation so severe as to constitute a threat to an individual's freedom or life. See Matter of Acosta, 19 I&N Dec. at 222. Prosecution for violating laws of general applicability does not constitute persecution unless the punishment is imposed for invidious reasons or is grossly disproportionate to the proscribed conduct. Id.

10

### a.    Past Persecution

An applicant shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she suffered persecution in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself of the protection of, that country owing to such persecution. 8 C.F.R. § 1208.13(b)(1). An applicant who is found to have established such past persecution shall also be presumed to have a well-founded fear of future persecution on the basis of the original claim. 8 C.F.R. § 1208.13(b)(1).

The regulatory presumption may be rebutted if the DHS establishes by a preponderance of the evidence that either: (1) there has been a fundamental change in circumstances[2] so that the applicant no longer has a well-founded fear of persecution in that applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of one of the enumerated grounds; or (2) the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, and under the circumstances, it would be reasonable to expect the applicant to do so. 8 C.F.R. § 1208.13(b)(1)(i), (ii). If the applicant's fear of persecution is unrelated to the past persecution, the applicant bears that burden of establishing that the fear is well-founded. 8 C.F.R. § 1208.13(b)(1).

### b.    Well-Founded Fear of Persecution

An applicant has a well-founded fear of persecution if: (1) the applicant has a fear of persecution in his or her country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he or she was to return to that country; and (3) he or she is unable or unwilling to return to, or avail himself of the protection of, that country because of such fear. 8 C.F.R. § 1208.13(b)(2)(i). In general, the applicant's fear should be considered well founded if the applicant can establish, to a reasonable degree, that his or her continued stay in that country has become intolerable for the applicant on the basis of one of the enumerated grounds, or would for the same reasons, be intolerable if he or she returned there. See Handbook on Procedures and Criteria for Determining Refugee Status, Office of the United Nations High Commissioner for Refugees, ¶42, p. 12-13. (Geneva, January 1992). An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the

---

[2]By adopting the language "fundamental change in circumstances" rather than requiring a showing of "changed country conditions" to overcome the presumption, other changes in the circumstances surrounding the asylum claim, including a fundamental change in personal circumstances may be considered, so long as those changes are fundamental in nature and go to the basis of the fear of persecution.

applicant's country of last habitual residence, if under all circumstances it would be reasonable to expect the applicant to do so. 8 C.F.R. § 1208.13(b)(2)(ii).

To establish a well-founded fear of persecution, an applicant must present credible testimony that demonstrates that his or her fear of harm is of a level that amounts to persecution, that the harm is on account of a protected characteristic, that the persecutor could become aware or is already aware of the characteristic, and that the persecutor has the means and inclination to persecute. See Matter of Mogharrabi, 19 I&N Dec. at 446; see also Matter of Acosta, 19 I&N Dec. at 226. A well-founded fear of persecution must be both subjectively genuine and objectively reasonable. See Cardoza-Fonseca, 480 U.S. at 430-31. To demonstrate a subjective fear of persecution, an applicant must demonstrate a genuine apprehension of awareness of the risk of persecution. See Matter of Acosta, 19 I&N Dec. at 221. The objective component requires a showing by credible, direct, and specific evidence in the record that the alien's fear of persecution is reasonable. See DeValle v. INS, 901 F.2d 787, 790 (9th Cir. 1990).

 c. *On Account of*

An applicant for asylum must demonstrate that he or she is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of his or her country because of persecution or a well-founded fear or persecution "on account of" race, religion, nationality, membership in a particular social group, or political opinion. INA § 1208.13(b)(2)(i)(A). Even treatment that is regarded as "morally reprehensible" is not "persecution" withing the meaning of the Act unless it occurs "on account of" one of the five enumerated grounds in the Act. See Matter of T-M-B-, 21 I&N Dec. 775 (BIA 1997).

 6. *Discretion*

Statutory and regulatory eligibility for asylum, whether based on past persecution or a well-founded fear of future persecution, does not necessarily compel a grant of asylum. See Cardoza-Fonseca, 480 U.S. at 441. As applicant for asylum has the burden of establishing that the favorable exercise of discretion is warranted. See Matter of Pula, 19 I&N Dec. at 471; see also Matter of Shirdel, 19 I&N Dec. 33 (BIA 1984). In exercising discretion, it is appropriate to examine the totality of the circumstances and actions of an alien in his or her flight from the country where persecution is feared. See Matter of Pula, 19 I&N Dec. at 473. Courts also consider whether the alien found safe haven after leaving the country where she claimed past or future persecution. See id.

General humanitarian reasons, independent of the circumstances that led to the applicant's refugee status, such as his or her age, health, or family ties, should also be considered in the exercise of discretion. Id. at 474. Although the totality of the circumstances and actions of an alien in his or her flight from that country where persecution was suffered to the United States are to be considered and may weight against a favorable exercise of discretion, "the danger of persecution should generally outweigh all but the most egregious of adverse factors." Id. at 474.

The Board has also held that even if there is little likelihood of future persecution, an applicant may establish eligibility or asylum if he or she shows that he or she has suffered such severe past persecution on account of one or more of the enumerated grounds that it would be inhumane to return him to his or her country. See Matter of Chen, 20 I&N Dec. 16 (BIA 1989).

C.      *Withholding of Removal Pursuant to INA § 241(b)(3)*

The burden of proof required to establish eligibility for asylum is lower than that required for withholding of removal, which requires the Respondent to show that it is "more likely than not" that he or she will be persecuted in Rwanda on account of a protected ground. 8 C.F.R. § 1208.16(b)(1); see INS v. Stevic, 467 U.S. 407 (1984); see also INS v. Cardoza-Fonseca, 480 U.S. at 463.   Aliens convicted of a particularly serious crime are ineligible for withholding of removal. 8 C.F.R. § 1208.16(d)(2).

D.      *Withholding and Deferral of Removal Under the Convention Against Torture*

An applicant for withholding or deferral of removal under the Torture Convention bears the burden of proving that it is "more likely than not" that he or she would be tortured if removed to the proposed country of removal.8 C.F.R. §§ 1208.17; 1208.16(c)(2). As for withholding of removal under INA § 241(b), aliens convicted of a particularly serious crime are ineligible for withholding of removal under the CAT. See 8 C.F.R. § 1208.16(d)(2).

Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. § 1208.18(a)(1).   Torture is an "extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman, or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2). Additionally, to constitute torture, the "act must be directed against a person in the offender's custody or physical control." 8 C.F.R. § 1208.16(a)(6). Further, the pain or suffering must be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "Acquiescence of a public official" requires that the public official, "prior to the activity constituting torture, have awareness of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); see also Matter of S-V-, 22 I&N Dec. 1306 (BIA 2002).

The evidentiary burden can be sustained by testimony without corroboration if the testimony is credible. 8 C.F.R. § 1208.16(c)(2); 8 C.F.R. § 1208.13(a); see also Matter of Y-B-, 21 I&N Dec. 1136 (BIA 1998). In assessing whether an applicant has satisfied the burden of proof, the Court must consider all evidence relevant to the possibility of future torture, including: evidence of past torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where she is not likely to be tortured; evidence of gross, flagrant, or mass violations of human rights within the country of removal; and other relevant information regarding conditions in the country of removal. 8 C.F.R. § 1208.16(c)(3). The Attorney General has held that protection under CAT cannot be established by stringing together a series of suppositions to show that it is more likely than not that torture will result where the evidence does not

establish that each step in the hypothetical chain of events is more likely than not to occur. Matter of J-F-F-, 23 I&N Dec. 912 (A.G. 2006).

## IV. DISCUSSION

*A.    Applications for Asylum and Withholding of Removal under INA § 241(b)(3) and CAT*

The credibility and burden of proof provisions of the REAL ID Act of 2005 govern this case.

### 1.    One-Year Deadline

The Court finds that Respondent meets the one-year asylum application deadline. See INA § 208(a)(2)(B). Respondent was lawfully present in the United States until his parole was revoked, when the District of Columbia District Court dismissed his case on August 17, 2006. Respondent's entry date, for purposes of the one-year bar, thus began at this date. See INA § 212(d)(5) (noting that the parole of an alien shall not be regarded as an admission). He filed his asylum application with the DHS on December 29, 2006, less than five months after his parole was revoked. Therefore, the Court finds that Respondent filed his asylum application within the one-year deadline under INA § 208(a)(2)(B).

### 2.    Mandatory Bars to Asylum and Withholding of Removal

The Court finds that two mandatory bars to asylum and withholding of removal apply to Respondent. First, Respondent ordered, incited, assisted, or otherwise participated in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. §§ 1208.13(c)(2)(i)(E), 1208.16(d)(2). Second, there are reasonable grounds for regarding Respondent as a danger to the security of the United States. 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2).

Notwithstanding the fact that these removal proceedings are civil proceedings and not governed by evidentiary requirements of federal criminal law, under the theory of *res judicata*, the Court recognizes the suppression by the District of Columbia District Court in United States v. Karake, supra, of statements Respondent made to Rwandan and American officials during the course of the investigation into the attack at Bwindi. The Court will adopt the District Court's finding that "the conditions under which defendants were held at Kami and the abuse and mistreatment they endured while being interrogated shock the conscience and therefore render their statements involuntary and inadmissible." Id. at 85-86.

If some appellate body should reverse this Court's reliance on the District Court's findings, and deem these statements admissible, the evidence would indicate that Respondent both participated in the persecution of others on account of race or nationality and that there are reasonable grounds for regarding him a danger to the security of the United States. See 8 C.F.R. § 1208.13(c)(2)(i)(E); 8 C.F.R. § 1208.13(c)(2)(i)(C). Specifically, Respondent admitted in these statements that he helped plan the Bwindi attacks, which resulted in the murder of eight tourists, that ALIR targeted "Anglophile" tourists of English or American nationality

in this attack, that he was present at some of the attacks, and that he helped orchestrate the burning of vehicles. See Karake, supra at 44-46. This act constitutes the persecution of others on account of race or nationality. See 8 C.F.R. §§ 1208.13(c)(2)(i)(E), 1208.16(d)(2). Respondent's active role as a sergeant in the Irondelle Company of ALIR, an organization that the State Department considers a terrorist group, also provides reasonable grounds for regarding Respondent as a danger to the security of the United States. See Exhibit 9, Tab 2; 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2).

If, however, an appellate body upholds the Court's decision that the statements of the Respondent are inadmissible and suppresses the evidence, the Court still would find that these mandatory bars apply to Respondent for the following reasons:

> a.   *Respondent Bears the Burden of Proof to Demonstrate that the Mandatory Bars Do Not Apply*

In this case, Respondent, who seeks to apply for relief from removal, bears the burden of establishing that he satisfies the applicable eligibility requirements and merits a favorable exercise of discretion. INA § 240(c)(4)(A)(i)-(ii); 8 C.F.R. § 1240.8(d).

Further, the Government's evidence in this case indicates that grounds for mandatory denial of Respondent's application for relief may apply. Respondent noted in his affidavit and testified that he had joined ALIR in 1997 and fought with ALIR against the RPF until 2001. See Exhibit 2. The record contains evidence that ALIR has been on the State Department's Terrorist Exclusion List since it was created in 2002. See Exhibit 9, Tab 2. Although the State Department Terrorist Exclusion List was not created until 2002 and the Respondent testified that he left ALIR in 2001, there is credible evidence in the record that ALIR committed terrorist acts while Respondent was a member. Specifically, the findings of fact in U.S. v. Karake relate that ALIR had kidnapped and murdered tourists in Bwindi on March 1, 1999 on the basis of their nationality. See Group Exhibit 8, Tab A, at 19-20.

Therefore, the Court finds that the DHS provides *prima facie* evidence that Respondent, as an ALIR member, may have ordered, incited, or otherwise participated in the persecution of others on account of race or nationality; and that there are reasonable grounds for regarding Respondent, who had fought with a militia that the U.S. Government considers a terrorist organization, as a danger to the security of the United States. See 8 C.F.R. § 1208.13(c)(2)(i)(E); 8 C.F.R. § 1208.13(c)(2)(i)(C); 8 C.F.R. § 1208.16(d)(2). The burden thus shifts to Respondent to establish, by a preponderance of the evidence, that such grounds are inapplicable. See 8 C.F.R. § 1208.13(c)(2)(ii); 8 C.F.R. § 1240.8(d); Matter of S-K-, 23 I&N Dec. 936, 939 (BIA 2006); Matter of R-S-H-, 23 I&N Dec. 629, 640 (BIA 2003).

> b.   *Respondent Is Unable to Establish that the Mandatory Bars Do Not Apply*

The Court finds that Respondent is unable to establish, by a preponderance of the evidence, that these mandatory bars to asylum and withholding of removal do not apply. See id.

Respondent, asserting his Fifth Amendment rights, refused the Government's requests to answer questions on the following issues: ALIR's objectives, whether Respondent fought against the RPF from 1997 to 2001; how Respondent fought against the RPF; whether, Respondent, as a member of ALIR, was present at the Bwindi attack on March 1, 1999; whether Respondent, as a member of ALIR, was a member of the Irondelle company; whether Respondent, as a member of ALIR, was involved in planning the Bwindi attack on March 1, 1999; whether Respondent, as an ALIR member, was ever reprimanded for violating its code of conduct; whether he ever was physically harmed by other ALIR members; and whether he, as an ALIR member, ever physically harmed any civilians; and whether Respondent ever participated in any attacks on civilians while he was part of ALIR.

It is proper for the Court to draw an unfavorable inference from his refusal to answer pertinent questions where such refusal is based upon a permissible claim of privilege, such as his Fifth Amendment Rights, as well as where privilege is not a factor. See Matter of O-, 6 I&N Dec. 246 (BIA 1954). Because the Government presented a prima facie case of removability, the logical conclusion to draw from Respondent's silence is that his withheld testimony would be adverse to his interests. See id.; see also Matter of J-, 8 I&N Dec. 568 (BIA 1960).

The adverse inference the Court may draw under Board precedent suggests that Respondent was a member of the Irondelle Company, and that he has harmed civilians and participated in the attack at Bwindi on March 1, 1999. See Matter of O-, supra; Matter of J-, supra. Respondent has submitted no evidence to support a claim that he did not participate in any atrocities against civilians or RPF members while he was in ALIR.

Based on the adverse inference, the Court finds that Respondent participated in the persecution of others on account of race or nationality and that there are reasonable grounds for regarding him a danger to the security of the United States. See 8 C.F.R. § 1208.13(c)(2)(i)(E); 8 C.F.R. § 1208.13(c)(2)(i)(C); 8 C.F.R. § 1208.16(d)(2). First, the questions Respondent refused to answer indicate that he was not only a member of ALIR, but a member of the Irondelle Company that attacked, murdered, and raped tourists at Bwindi on March 1, 1999. See Karake, supra at 19-20. Second, the questions suggest that Respondent, personally, participated in this attack. Third, the admissible background information in Karake relates that ALIR targeted individuals whom they deemed "Anglophiles," or associated with the English or Americans. Id. Fourth, Respondent's membership in the Irondelle Company of ALIR, situates him in the midst of these atrocities. See id. His participation in the attack thus would constitute the persecution of others on account of race or nationality. See 8 C.F.R. §§ 1208.13(c)(2)(i)(E), 1208.16(d)(2). Further, the State Department considers ALIR a terrorist group, providing reasonable grounds for regarding Respondent as a danger to the security of the United States. See Exhibit 9, Tab 2; 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2).

If some appellate body should find that this Court is not entitled to draw an adverse inference from Respondent's refusal to answer the Government's questions on cross examination, it still would find that Respondent failed to meet its burden to establish, by a preponderance of the evidence, that these mandatory

16

bars to asylum and withholding of removal do not apply. See 8 C.F.R. § 1208.13(c)(2)(ii); 8 C.F.R. § 1240.8(d); Matter of S-K-, 23 I&N Dec. 936, 939 (BIA 2006); Matter of R-S-H-, 23 I&N Dec. 629, 640 (BIA 2003). Respondent admitted in his written and oral testimony that he was a member of ALIR and participated in ALIR activities. The non-suppressed evidence in the record also indicates that ALIR kidnapped, attacked, murdered, and raped tourists, whom ALIR had identified as "Anglophiles" or persons associated with the English or Americans. See Karake, supra at 19-20; Exhibit 9, Tabs 5-6. Respondent provided no evidence to establish, by a preponderance of the evidence, that he did not participate in these atrocities, and thus persecute others on account of race of nationality. See 8 C.F.R. §§§ 1208.13(c)(2)(ii), 1208.13(c)(2)(i)(E), 1208.16(d)(2).

Moreover, Respondent failed to meet his burden to demonstrate that he would not constitute a danger to the security of the United States. See 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2). Respondent's admission that he was a member of ALIR and participated in ALIR activities suggests that he was a member of a terrorist organization, pursuant to the State Department's Terrorist Exclusion List. See Exhibit 9, Tab 2. The record also indicates that the U.S. government considers organizations on this list sources of violence and global insecurity. Id. Because Respondent merely protested, but did not provide evidence to rebut, the DHS' claim that he is a member of a group that the U.S. Government deems a terrorist organization, the Court finds that there remain reasonable grounds for regarding him as a danger to the security of the United States. See 8 C.F.R. §§ 1208.13(c)(2)(i)(C), 1208.16(d)(2). As such, he is ineligible for asylum, withholding of removal under INA § 241(b)(3), and withholding of removal under the Convention Against Torture. See INA §§§ 208(b)(2)(A)(i), (iv), 241(b)(3)(B); 8 C.F.R. § 1208.16(d)(2).

   3.   *Credibility*

After viewing the totality of Respondent's record, the Court finds that Respondent is not a credible witness in regard to his role in ALIR and its attacks on civilians in 1999. The Court finds Respondent's claim of torture in 2002 by the RPA credible based on the District Court's decision. In assessing the credibility of his testimony, the Court has taken into account the plausibility and consistency of his account, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of his claim. See INA § 208(b)(1)(B)(iii).

An asylum applicant must establish the facts underlying his claim for relief by believable, consistent, and sufficiently detailed evidence that provides a plausible and coherent account of the basis of her fear. Testimony is not considered credible when it is inconsistent, contradictory with current country conditions, or inherently improbable. See Matter of S-M-J-, 21 I&N Dec. at 729. The Court finds that Respondent was not a credible witness in regard to several of his activities with ALIR.

Specifically, the Court finds Respondent's testimony relating to his role in ALIR atrocities not credible. Respondent, asserting his Fifth Amendment rights, refused the Government's requests to answer questions on the following issues: ALIR's objectives, whether Respondent fought against the RPF from 1997 to 2001; how Respondent fought against the RPF; whether, Respondent, as a member of ALIR, was present at the

17

Bwindi attack on March 1, 1999; whether Respondent, as a member of ALIR, was a member of the Irondelle company; whether Respondent, as a member of ALIR, was involved in planning the Bwindi attack on March 1, 1999; whether Respondent, as an ALIR member, was ever reprimanded for violating its code of conduct; whether he ever was physically harmed by other ALIR members; and whether he, as an ALIR member, ever physically harmed any civilians; and whether Respondent ever participated in any attacks on civilians while he was part of ALIR.

Based on Respondent's refusal to answer questions on these aspects of his participation in ALIR, the Court finds that Respondent could not explain or substantiate his claim that he did not participate in any atrocities as a soldier. The Court thus finds Respondent's testimony regarding his participation in attacks by ALIR incomplete and inconsistent. See § 208(b)(1)(B)(iii); see also Matter of S-M-J-, supra. Therefore, Respondent must submit corroboration to bolster his claim of benign ALIR activities. See id. at 720. Respondent has submitted no corroborating evidence to support his claim that he did not participate in any atrocities against civilians or RPF members while he was in ALIR.

The Court, however, finds other aspects of Respondent's testimony credible based on the District Court's findings. Specifically, Respondent provided independent documentation of his claims of torture in 2002 by the RPA. Respondent indicates in his asylum application that the RPA tortured him by kicking him, slapping his hears, hitting him on the chest and back with a sock containing a brick, and striking him on the soles of his feet. See Exhibit 2. They also subjected him to long period of solitary confinement, shackled his wrist to the opposite ankle, bound him above the elbows for long periods of time, deprived him of food and clothing, confined him in a cell with no mattress or chair, and forced him to stand or sit in water thrown in his cell. See id. The RPA also repeatedly threatened to kill him. Id.

The evidence in the record independently supports Respondent's account of physical and psychological abuse by the RPA following his arrest in 2002. See Camara, supra; Matter of S-M-J-, supra. First, the Court accepts the 2006 findings by the District of Columbia District Court that Respondent endured "countless hours of repetitive questioning over a period of many months" when he was "subjected to periods of solitary confinement, positional torture, and repeated physical abuse" that "shock the conscience." See Group Exhibit 8, Tab A, at 94. Specifically, his physician found that he showed signs of trauma to his arms, legs, and hips that were "highly indicative of *prolonged extremely tight binding* of his arms...and legs" that were consistent with his reports of having to drag himself on the ground while bound, in an extremely tight manner over a period of days to weeks." See id. at 65-66 (emphasis in original); see also Group Exhibit 8, Tabs B, C. The doctor also identified rope-like scars on his wrist, and other marks "highly consistent" with tight binding. See id.; see also Group Exhibit 8, Tabs B, C.

Other evidence in the record further corroborates this finding. The 2006 State Department Country Report for Rwanda indicates "deplorable conditions" in government-run detention centers, where detainees are subject to beatings, inadequate food, water and medical care. See Group Exhibit 8, Tab D at 104. The 2005 Country Report also reports the use of torture and excessive force by security forces and harsh prison and detention center conditions. See id. at 121. Amnesty International further reports extrajudicial

18

executions and "harsh" and "cruel" treatment in military detention centers. See Group Exhibit 8, Tab E.

After considering the totality of his documentary record, the Court therefore finds that Respondent failed to provide a plausible and coherent account of his activities in ALIR. See Matter of Dass, 20 I&N Dec. 120, 124 (BIA 1989); see also 8 C.F.R. § 1208.13(a). Respondent's omission of key events, coupled with inconsistencies between the testimony he did submit and the record, provide a specific and cogent reason to support an adverse credibility finding. See Matter of A-S-, 21 I&N Dec. 1106 (BIA 1998). However, the Court finds that Respondent's account of his torture by the RPA in 2002 credible. See INA § 208(b)(1)(B)(iii).

### 3.    Article 3 of the Torture Convention

Deferral of removal under the Convention Against Torture may be available to an alien otherwise precluded from asylum or withholding of removal by a mandatory bar. See 8 C.F.R. §§ 1208.16(d)(2), 1208.17(a). The Court has found that two mandatory bars apply to Respondent—that he participated in the persecution of others on account of race or nationality and that there are reasonable grounds for regarding him a danger to the security of the United States. See 8 C.F.R. §§ 1208.13(c)(2)(i)(E), § 1208.13(c)(2)(i)(C). As such, he is ineligible for withholding of removal under CAT, and the only available relief is deferral of removal. 8 C.F.R. § 1208.16(d)(2).

Respondent qualifies for deferral of removal under the Torture Convention. First, Respondent has established a credible fear of torture in Rwanda. The Court adopts the District of Columbia District Court's finding in Karake that Respondent, suffered torture at Kami camp. Specifically, he endured "countless hours of repetitive questioning over a period of many months," when he was "subjected to periods of solitary confinement, positional torture, and repeated physical abuse," and that the abuse and mistreatment he experienced at Kami "shock the conscience." See Karake, supra at 85-86, 94. Evidence in the record indicates that Respondent suffered trauma to his arms, legs, and hips after "having to drag himself on the ground while bound, in an extremely tight manner over a period of days to weeks." See id. at 65-66 (emphasis in original); see also Group Exhibit 8, Tabs B, C.

The record also indicates that Respondent more likely than not, as a returning ex-ALIR prisoner under the RPF regime, will continue to endure similar treatment in Rwanda. The 2006 State Department Country Report for Rwanda indicates "deplorable conditions" in government-run detention centers, where detainees are subject to beatings, inadequate food, water and medical care. See Group Exhibit 8, Tab D at 104. The 2005 Country Report also reports the use of torture and excessive force by security forces and harsh prison and detention center conditions. See id. at 121. Amnesty International further reports extrajudicial executions and "harsh" and "cruel" treatment in military detention centers. See Group Exhibit 8, Tab E. The Court thus finds that Respondent, a prisoner considered an enemy of the current regime, faces a significant threat of physical force, beatings, and other serious abuse if he returns to Rwanda.

Second, Respondent demonstrates that this treatment he fears in Rwanda constitutes torture. Torture is defined as an "extreme form of cruel and inhuman treatment...by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. §§ 1208.18(a)(1), (2). The District of Columbia District Court had found that the treatment Respondent and his co-defendants in Karake experienced in Rwanda constitutes torture. See Karake, supra at 85-86, 94. The District Court also noted witness and U.S. government agency reports of abuse, torture, and other inhumane conditions at the Kami detention center. Id. at 69. Forced confessions, through torture, were common, and reports of disappearances and extrajudicial killings persist. Id. at 69-73.

Third, Respondent has established that public officials in Rwanda would acquiesce in Respondent's torture. See Matter of S-V-, 22 I&N Dec. 1306 (BIA 2000). Kami Camp, along with other RPA-affiliated detention centers, are government-run facilities. See Karake, supra at 15. Moreover, the District Court notes that Respondent recently was under the supervision of Rwanda's Department of Military Intelligence ("DMI") at Kami Camp. See id. at 22 n.9. This information thus strongly suggests that Rwandan authorities, some of whom tortured Respondent while interrogating him, are aware of the use of torture in government-run facilities and breach their legal responsibility to intervene. 8 C.F.R. § 1208.18(a)(7); see also Matter of S-V-, supra.

Fourth, this case does not present a J-F-F- situation in which the applicant or the Immigration Judge postulate an unlikely string of suppositions in a futile attempt to create a probability out of a series of improbabilities. See Matter of J-F-F-, supra. This Respondent has provided corroborating documentation establishing that representatives of the current Rwandan government have a history of using torture against former ALIR members in prison, and that torture by the same authorities upon his return to Rwanda is probable, particularly since Respondent exposed the use of torture and other abuse by government officials at their military camps.

Moreover, in commenting on this case, the State Department provided no assurances that Respondent is not likely to be tortured in Rwanda. See 8 C.F.R. § 1208.18(f). Rather, it noted that the authorities would prosecute Respondent after he returns to Rwanda, and that Rwandan authorities have made "positive efforts" to improve prison and detention center conditions. See Exhibit 11. The letter vaguely indicated that reports of such treatment "have decreased," but also suggests that abuse and torture in Rwandan prisons still exist. See id. In the context of other evidence in the record that notes torture is common in government-run prisons, these efforts thus do not appear to alleviate the danger Respondent faces upon his return to Rwanda.

Therefore, the Court finds that Respondent has borne his burden to establish eligibility for deferral of removal under the Convention Against Torture by a preponderance of the evidence, and will grant his application for such relief.

Accordingly, after a careful review of the entire record, and for the reasons stated above, the Court enters the following Order:

## ORDER

| | |
|---|---|
| <u>It Is Ordered that:</u> | Respondent's application for asylum, pursuant to INA § 208(a), be **DENIED**. |
| <u>It Is Further Ordered that:</u> | Respondent be **REMOVED** to Rwanda pursuant to the charge in his Notice to Appear. |
| <u>It Is Further Ordered that:</u> | Respondent's application for withholding of removal to Rwanda, pursuant to INA § 241(b)(3), be **DENIED**. |
| <u>It Is Further Ordered that:</u> | Respondent's application for withholding of removal to Rwanda, pursuant to the Convention Against Torture, be **DENIED**. |
| <u>It Is Further Ordered that:</u> | Respondent's application for deferral of removal under Article 3 of the Convention Against Torture be **GRANTED**. |
| <u>It Is Further Ordered that:</u> | In accordance with 8 C.F.R. § 208.17(a), the respondent is hereby notified that deferral of removal: (1) does not confer any lawful permanent immigration status in the United States; (2) will not necessarily result in the respondent's release from DHS custody if the respondent is subject to DHS custody; (3) is effective only until terminated; (4) is subject to review and termination if an Immigration Judge determines that it is not likely that the respondent would be tortured in the country to which removal has been deferred or if the respondent requests that deferral be terminated; (5) applies only to the country in which it has been determined that the respondent is likely to be tortured and that the respondent may be removed at any time to another country where he is not likely to be tortured. |

_9 - 5 - 07_
Date

_Wayne R. Iskra_ (signature)

Wayne R. Iskra
United States Immigration Judge

21